UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ARANTZAZÚ ZUZENE GALDÓS-SHAPIRO | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| THE TOWN OF GREAT BARRINGTON,  THE | ) | |
| BERKSHIRE HILLS REGIONAL SCHOOL | ) | |
| DISTRICT, PAUL E. STORTI, JOSEPH O'BRIEN, | ) | |
| and PETER DILLON, | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT AND JURY DEMAND**

1.      Plaintiff Arantzazú Zuzene Galdós-Shapiro ("Ms. Galdós-Shapiro") is a queer, Mexican-American public school teacher. On December 8, 2023, Ms. Galdós-Shapiro had finished teaching for the day and was in the library talking to a colleague when she was unexpectedly approached by the Principal of her school. The Principal directed her to accompany him to her classroom, which she did. Once Ms. Galdós-Shapiro and the Principal entered her classroom, another individual, who she would momentarily learn was a plainclothes Great Barrington Police Officer, Defendant Joseph O'Brien ("Officer O'Brien"), followed the pair into her empty classroom. Although there was no reason to do so since students had left for the day and the hallway was empty, Officer O'Brien then intentionally shut the classroom door behind him and placed himself between Ms. Galdós-Shapiro and the closed door thereby making it clear

to her that she could not leave. Officer O'Brien then turned on his body camera and initiated an unlawful interrogation of Ms. Galdós-Shapiro and a search of her classroom.

2.      Officer O'Brien's body camera (which Officer O'Brien partially obscured with his sweatshirt in violation of applicable policy) captured the audio of what happened next. Officer O'Brien made clear to Ms. Galdós-Shapiro that he was conducting a criminal investigation of her resulting from her possession of a book in her classroom because the content of the book was, according to him, obscene and illegal, and could not be shown to students. At this point, Officer O'Brien had never actually seen the book, reviewed it or researched it. The book is titled *Gender Queer*. It is an award-winning book with an indisputable educational, literary, and societal purpose. Many educators and parents consider *Gender Queer* a lifeline to young LGBTQ students.  The book was properly in Ms. Galdós-Shapiro's classroom at all times. It was not and is not obscene or illegal under any applicable legal standard, as was well-known to law enforcement or would have been known upon any meaningful inquiry. To the extent that anyone believed otherwise, no one had made a complaint about the book by following the readily available and publicized procedure for challenging classroom content. The Berkshire Hills Regional School District (the "District") had not banned the book. Simply put, Officer O'Brien had no lawful or proper basis to be in the classroom, to interrogate Ms. Galdós-Shapiro, or to conduct the search he conducted. But Officer O'Brien went further. In the course of his coercive, custodial communications with Ms. Galdós-Shapiro, who could not locate the book in her classroom, he asserted that he had the right to search the entire school for the book, he went through the classroom looking at private materials belonging to students, and he ordered Ms. Galdós-Shapiro and the Principal to provide the book to him as soon as it was located.

3.      As is now known, the sole alleged and legally deficient "source" for any complaint about the book or Ms. Galdós-Shapiro was a disgruntled school janitor (the "Complainant") whose report was self-evidently incredible and unreliable but as to which the Great Barrington Police Department ("GBPD") decided to afford complete and ongoing acceptance and anonymity. The Complainant did not come close to presenting as a qualified or acceptable confidential source. Among other things, the janitor was *already known* to be legally adverse to the Town of Great Barrington (the "Town") and the District for his unacceptable performance and behavior including his having made homophobic and racist comments; facts readily available to Defendants before they undertook any steps at all before taking their unlawful actions. The Complainant made false, obviously outrageous and implausible reports about Ms. Galdós-Shapiro supposedly having students sit on her lap, discussing "LGBTQ material" and telling them to keep conversations from their parents, all of which the GBPD themselves had *already dismissed* as not worth investigating *before* Officer O'Brien ever entered Ms. Galdós-Shapiro's classroom and before he ever questioned Ms. Galdós-Shapiro, as demonstrated by the recorded fact that the *sole* matter of concern he confronted Ms. Galdós-Shapiro with was with regard to *Gender Queer* and nothing else. For its part, the District aided and abetted and conspired with law enforcement to ignore completely existing and established policies governing Ms. Galdós-Shapiro's rights to be informed of any complaint made against her before she had to answer questions and to have a representative with her when questioned.

4.      Following the unlawful events of December 8th, Defendants continued with their unlawful and outrageous conduct. They made public Ms. Galdós-Shapiro's name, address, and date of birth in connection with the false allegations about her made by the Complainant, allegations which they had already dismissed for lack of veracity. At the same time, they refused

to disclose the identity of the Complainant despite Ms. Galdós-Shapiro, faculty and students being in fear, feeling threatened, and deeply worried about their safety at school. The District was fully complicit in these acts and omissions, and only even requested the Complainant's name after Ms. Galdós-Shapiro demanded that they do so.

5.       Put simply, Defendants' actions were unlawful, inept, and without any basis in proper and established procedure, or in fact or law. The unwarranted criminal investigation and interrogation that they inflicted on Ms. Galdós-Shapiro and the resulting aftermath, including Defendants' decision to publish the baseless, false, and defamatory allegations against Ms. Galdós-Shapiro—including the allegation that she was, essentially, a pedophile—left her devastated and profoundly shaken, ill, distressed, and fearful, her reputation publicly destroyed. Unable to return to the classroom, and in fear about what unknown person or persons had falsely started the attack upon her which Defendants then carried out, Ms. Galdós-Shapiro was forced to take an extended leave of absence from her job.

6.       Defendants' blatant violations of Ms. Galdós-Shapiro's rights under federal and Massachusetts law, the conspiracy they entered into with each other to deny Ms. Galdós-Shapiro her rights, and their subsequent defamation of her,[1] has caused her serious and ongoing harm for which she now seeks monetary and other relief.

## **PARTIES**

7.       Plaintiff Ms. Arantzazú Zuzene Galdós-Shapiro is a natural person and a resident of Richmond, Massachusetts.

---

[1] Ms. Galdós-Shapiro is in the process of serving presentment letters on Defendants in relation to her claims that fall under the Massachusetts Tort Claims Act, specifically, her claims for Defamation and Infliction of Emotional Distress. Ms. Galdós-Shapiro will move to amend her Complaint to bring those claims once the presentment requirement is satisfied.

8. Defendant Paul E. Storti ("Chief Storti") is a natural person and is a resident of the Commonwealth of Massachusetts. Chief Storti is and was at all times relevant to this lawsuit employed by the Town as the Chief of the GBPD. Chief Storti is being sued in his official and individual capacity.

9. Defendant Officer Joseph O'Brien is a natural person and resident of the Commonwealth of Massachusetts. He is and was at all times relevant to this lawsuit employed by the Town as an officer in the GBPD. Officer O'Brien is being sued in his official and individual capacity.

10. Defendant Dr. Peter Dillon ("Dr. Dillon") is a natural person and resident of the Commonwealth of Massachusetts. He is and was at all times relevant to this lawsuit employed by the District as the Superintendent. Dr. Dillon is being sued in his official and individual capacity.

11. Defendant Town of Great Barrington is a municipal corporation located within Berkshire County, the Commonwealth of Massachusetts, with a principal place of business located at 334 Main Street, Great Barrington, MA 01230.

12. Defendant Berkshire Hills Regional School District is a municipal corporation located within Berkshire County, the Commonwealth of Massachusetts, with a principal place of business located at 50 Main Street, Stockbridge, Massachusetts 01262.

## JURISDICTION

13. Plaintiff's action for violation of her rights guaranteed by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution is brought pursuant to the provisions of 42 U.S.C § 1983.

14. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 (federal questions) and 1343 (civil rights).

## VENUE

15.     This action is properly brought in the Western Division of the United States

District Court for the District of Massachusetts under 28 U.S.C. §§ 1391(b)(1) and (2) because

the events at issue in the case arose and transpired in the Western Division of the District of

Massachusetts.

## FACTUAL ALLEGATIONS

### Ms. Galdós-Shapiro's Outstanding Reputational Background

16.     Ms. Galdós-Shapiro first became familiar with the Town of Great Barrington

when she attended Bard College at Simon's Rock, a college located in Great Barrington. Ms.

Galdós-Shapiro, a college linguistics and German Studies major, began working at the local

independent bookstore, The Bookloft, following her graduation from college. During her time at

The Bookloft, Ms. Galdós-Shapiro was the children's book buyer, was a New England

Children's Booksellers Association *Windows & Mirrors Committee* Reading Panel Member and

appointed Publisher Coordinator in the committee to determine and award the best children's

literature with positive diverse representation published in each calendar year, and was invited to

be an expert panelist for a discussion on graphic novels for kids at the nation's largest book

convention.

17.     Recognizing Ms. Galdós-Shapiro's expertise, many current and former teachers

encouraged her to pursue a career in education.

18.     Ms. Galdós-Shapiro followed through on that encouragement, and became an 8th

grade English Language Arts ("ELA") teacher at Du Bois Regional Middle School (the "Middle

School") in the Town in 2018. Ms. Galdós-Shapiro has remained at the Middle School, which is

part of the District, since that time, other than when she was forced to take a leave as a result of what happened to her as alleged in this lawsuit.

19.     As a result of her dedication and excellent teaching skills, Ms. Galdós-Shapiro became a highly respected and well-liked educator. She was admired by both other teachers and her students, as well as their parents. Over time, Ms. Galdós-Shapiro consistently took on increasing responsibility, doing so as a commitment to her school and the students that she teaches.

20.     Ms. Galdós-Shapiro became an Instructional Lead for the Middle School, which is part of the Middle School's governance team. In this role, which she has held since 2021, Ms. Galdós-Shapiro, along with four of her peers, works with the principal to develop new instructional practices, implement professional development, provide feedback to the District, offer expertise and guidance to other teachers, and generally be the experts interfacing between administration and teachers. She also became a Crew Leader, a position through which she works with students to hone their academic and social emotional skills. Further, Ms. Galdós-Shapiro served as a Crew Coordinator for a year. The Instructional Lead position and Crew Coordinator position are the highest-ranking positions a teacher can be appointed to, and Ms. Galdós-Shapiro is the only teacher in the Middle School to have held both of these positions— each of which she was appointed to by Dr. Dillon.  Dr. Dillon also specifically selected Ms. Galdós-Shapiro to serve on the principal search committee in 2023 to help interview candidates and weigh in on the final decision.

21.     Importantly, Dr. Dillon appointed Ms. Galdós-Shapiro to be the advisor to the local chapter of the Gender and Sexuality Alliance ("GSA"), also a paid position. The GSA is a national network of student-run organizations which unite LGBTQ+ and allied youth in an effort

to build their community and to enable them to organize around issues impacting them in their schools and communities. GSA chapters have been confirmed to have a positive, ongoing effect on students' health, mental health, wellness, and academics. They protect students from harassment based on sexual orientation or gender identity, and they improve school environments generally. GSA chapters are legally protected in Massachusetts. Ms. Galdós-Shapiro was lauded by students and their parents alike for her advisory role with the GSA. The GSA meets in Ms. Galdós-Shapiro's classroom during the seventh and eighth grade Friday lunch and recess block. GSA meetings are run by the students in the group.

22.     Finally, over the past year, Ms. Galdós-Shapiro also served as the crew club advisor for the student-proposed and student-run Black, Indigenous, and People of Color club, which meets during 8th grade Friday crew blocks. To say that Ms. Galdós-Shapiro had built through her hard work an excellent reputation and life which was a gift to her Middle School community would be a gross understatement. This is what Defendants destroyed.

**Ms. Galdós-Shapiro's Classroom Library**

23.     Over several years, Ms. Galdós-Shapiro built up and maintains an extensive library in her classroom. The majority of those books are available to the students in Ms. Galdós-Shapiro's ELA class, and they are kept on bookshelves that line the perimeter of her classroom.

24.     Ms. Galdós-Shapiro also maintains a smaller selection of books for students in the GSA. These books, which address gender identity and sexuality, are selected by both Ms. Galdós-Shapiro and the students in the GSA, and are kept in a separate section of Ms. Galdós-Shapiro's classroom. *Gender Queer* was originally brought to the school at the request of the school librarian for display during the 2023 Banned Book Week. Eventually it was housed in the GSA portion of the bookshelves in Ms. Galdós-Shapiro's classroom.

25.     *Gender Queer* is an award-winning book.  It addresses issues of self-identity, the confusion of adolescence, and coming out as nonbinary. Certain homophobic extremist advocates, notably the so-called "Moms for Liberty," have attempted to censor the book in certain jurisdictions in the United States, but even in the face of these hate-filled attacks its important and worthy content has been established and recognized nationally.

26.     Ms. Galdós-Shapiro's classroom was not the only place in the Middle School that at times housed the book, and in fact it was present in the 7th grade ELA classroom.

27.     Nonetheless, *Gender Queer* was not part of the Middle School's formal required curriculum. Ms. Galdós-Shapiro never assigned the book to her students to read or even made it available to them generally. On the contrary, after lending the book to the Middle School library's display, only one student in the GSA asked to check the book out after seeing it on display. Ms. Galdós-Shapiro knew the family of that student well and knew that the student's parents were supportive of the student and the GSA. Thereafter, Ms. Galdós-Shapiro placed the book on the bookshelf in her classroom and put in place a mechanism by which a student would need to ask for the book in order to check it out.

28.     As of December 8, 2023, no one had ever challenged *Gender Queer* to either the District or the Middle School. Had a parent or other interested individual wanted to challenge the book, there was a known and established process for them to do so. Specifically, the District's written policies, specifically Policy KEC – Public Complaints about the Curriculum or Instructional Materials, states, in relevant part:

A.  "Criticism of a book or other materials used in the District may be expected from time to time. In such instances: … (2) The School Committee **will not permit any individual or group to exercise censorship over instructional materials and library collections**, but recognized that at times a reevaluation of certain material may be desirable. Should an individual or group ask to have any book or other material withdrawn from school use: (a) the person who objects to the book or

9

other material will be asked to sign a complaint on the standard form on which he/she will document his/her criticism; (b) following receipt of the formal complaint, the Superintendent will provide for a reevaluation of the material in question. He/she will arrange for the appointment of a review committee from among the faculty to consider the complaint; (c) the superintendent will review the complaint and the committee's reevaluation and will render a decision in the matter. Should the decision be unsatisfactory to the complainant, he/she may appeal it to the School Committee."

(Emphasis added). A copy of this policy is attached as **Exhibit 1**.

### The Baseless and Unwarranted Criminal Investigation Against Ms. Galdós-Shapiro

29.     On or around December 8, 2023, a known, disgruntled homophobic Middle School janitor, the Complainant, made a criminal complaint to the GBPD targeting Ms. Galdós-Shapiro (the "Criminal Complaint"). The Complainant insisted upon anonymity and inexplicably and reflexively was given it by the GBPD even though there was no basis for considering him a qualified confidential source, and he was a person known to Defendants to have an axe to grind against the Middle School where he had been disciplined, including for making homophobic comments and racist comments. Worse, his allegations were inherently implausible, e.g., he did not and could not explain how as a janitor who worked evenings he would even have had an opportunity to observe and/or hear Ms. Galdós-Shapiro and her students in her classroom during school hours. Yet, because of the nature of the allegation involving LGBTQ+ content, Defendants accepted without inquiry the Complainant's false allegations that Ms. Galdós-Shapiro had: (i) disseminated obscene and pornographic material to minors (by making the book *Gender Queer* available to them); (ii) allowed students to sit on her lap; and (iii) met with students in private to discuss "LGBTQ material" and told the students not to tell their parents about it. See Narrative of Officer O'Brien, ¶1, attached as **Exhibit 2**. Ms. Galdós-Shapiro believes and therefor alleges that Defendants treatment of her in reaction to the janitor's allegations was unprecedented and disparate from other similarly situated individuals and

matters.  Indeed, the knee-jerk and thoughtless reaction of certain public officials such as the Berkshire County District Attorney (the "District Attorney") himself are clear evidence of this disparate treatment.

30.     Along with his false verbal complaint, the Complainant allegedly presented three photographs from *Gender Queer*, including two photographs of the cover page and one photograph of two interior pages, that he claimed to have taken in Ms. Galdós-Shapiro classroom while he was working his nighttime shift. See Great Barrington Police Department Image Associated With Case Number 23-300-OF, attached as **Exhibit 3**.

31.     The Complainant relayed his false allegations directly to Officer O'Brien, the officer who was on dispatch duty that day. In doing so, he demanded anonymity because, he stated, he was "afraid of retaliation." Officer O'Brien reflexively and without any necessary inquiry agreed to keep the Complainant's identity anonymous. He did so without ever investigating or inquiring into the reliability of the Complainant as a source.

32.     Had Officer O'Brien made any reasonable attempt to investigate the allegations he would have quickly learned that the Complainant was not only unreliable but also homophobic and racist based upon information readily available to him. In his unlawful rush to pursue a queer and Mexican-American teacher over a book about LGBTQ+ matters, he never stopped to make inquiry. Upon information and belief, this was a departure from usual and acceptable police practice and was unlawfully disparate treatment of Ms. Galdós-Shapiro.

33.     Among other facts, the following is some of what Officer O'Brien willfully ignored or blinded himself to: at the time that he walked into the GBPD to complain about Ms. Galdós-Shapiro, the Complainant already had a history of making discriminatory statements to and about people of color and those associated with the LGBTQ+ community. He had previously

falsely accused Ms. Galdós-Shapiro of "teaching kids how to have gay sex" to another teacher, resulting in his supervisors admonishing the Complainant not to relay such messages to teachers or staff. Several months later, and only about one month before he levelled his Criminal Complaint against Ms. Galdós-Shapiro, the Complainant berated another female Hispanic teacher, claiming falsely that her students did not respect her, which he was not in a position to assess, and instructed her how to change her students' behavior. As a result of his outburst, his supervisors reprimanded the Complainant in writing, advising that any further behavior would result in his immediate termination. Further, the supervisors suspended the Complainant for two days.

34.     In response, on December 2, 2023, the Complainant filed a Charge of Discrimination against the District falsely claiming that *it* had discriminated against *him* in suspending him and issuing the letter of reprimand to him.

35.     This MCAD Complaint was active at the time the Complainant made his Criminal Complaint against Ms. Galdós-Shapiro, and it was known both to the District and the Town.

36.     Nonetheless, despite the Complainant's prior displays of animus towards people of color and those in the LGBTQ+ community—things that were common knowledge to the District and plainly available to the GBPD— Officer O'Brien and Defendants, in concert with each other, inexplicably and without basis chose to credit the Complainant's inflammatory allegations and immediately opened and then pursued a criminal investigation into Ms. Galdós-Shapiro.

### The GBPD's and District's Investigation into Ms. Galdós-Shapiro

37.     Immediately after receiving the Criminal Complaint, Officer O'Brien called Chief Storti to discuss the allegations, who in turn called District Superintendent Dr. Dillon to describe

the baseless accusations, including the allegations that *Gender Queer* contained pornographic illustrations. Because of the refusal by any of the Defendants to identify the Complainant, none of these Defendants stopped to think about the origin of the Complaint and recognize its inherent implausibility and retaliatory nature.

38.     Neither Chief Storti nor Dr. Dillon were familiar with *Gender Queer*, nor did they make any attempt to research *Gender Queer*. Had they conducted this research, through even a simple Google search, prior to Officer O'Brien's unlawful interrogation of Ms. Galdós-Shapiro, that search would have provided them with immediate proof of the literary and artistic content and value of the book, as well as the many districts that had already assessed the book and *decided not to ban it*. That search would have destroyed any notion that the book was "obscene" or that the teacher housing it in her classroom was criminally disseminating "obscene material" to minors.

39.     During their conversation, Chief Storti revealed to Dr. Dillon that Ms. Galdós-Shapiro was the teacher identified in the Criminal Complaint. As Dr. Dillon well knew, Ms. Galdós-Shapiro was a well-loved teacher who had never had any disciplinary action taken against her and had never engaged in any inappropriate conduct with students or otherwise.

40.     Despite advising Dr. Dillon of Ms. Galdós-Shapiro's identity, Chief Storti did not disclose and Dr. Dillon did not insist on disclosure of the identity of the Complainant before allowing the criminal investigation to proceed.  Dr. Dillon for his part also failed to  follow policy requiring that Ms. Galdós-Shapiro be informed of the allegations against her prior to any interview and have the opportunity to have a representative present with her at the interview. Chief Storti, like Officer O'Brien, conspired in the failure to delve into the identity of the Complainant, despite Dr. Dillon's having actual knowledge of the Complainant's failings and

hostilities at his fingertips which would have made clear the unlawful and retaliatory nature of what the janitor was doing.

41.    Throughout their conversation, Dr. Dillon failed to inform Chief Storti of the well-established District policies and procedures surrounding both a complaint against a book and a complaint against a faculty member.

42.    Specifically, as set forth above, District Policy KEC – Public Complaints about the Curriculum or Instructional Materials makes explicitly clear that "The School Committee *will not permit any individual or group to exercise censorship over instructional materials and library collections*," but instead sets forth a clear process through which an individual can complain about a book, and a review committee comprised of faculty will determine whether to ban the book, with the complainant having a right to appeal their decision to the School Committee. See **Exhibit 1**. Despite Dr. Dillon's failure to inform Chief Storti of the District's policy on assessing whether a book is obscene, Chief Storti and others at the GBPD, including Officer O'Brien, were well aware that it was not within their purview to determine whether a book was obscene.

43.    Further, Defendants were fully aware that Ms. Galdós-Shapiro was fully protected as a teacher under Massachusetts law from prosecution for claims of disseminating harmful materials to a minor under M.G.L. c. 272 §28.

44.    Defendants also violated the District Policies which address any investigation into a teacher. District Policy KEB – Public Complaints about District Employees states, in part:

A.  "Complaints about District employees will be investigated fully and fairly. However, before any such complaint is investigated, the complainant must submit his/her complaint in writing. ***Anonymous complaints will be disregarded***…The procedures will require that an employee who is the object of a complaint be ***informed promptly*** and be afforded the opportunity to present the facts as he/she sees them."

(Emphasis added). A copy of this policy is attached as **Exhibit 4**.

45.     Far from halting the GBPD's investigation into Ms. Galdós-Shapiro, Dr. Dillon instead conspired to advance the unlawful investigation, contacting both School Committee Chair Stephen Bannon and Middle School Principal Miles Wheat ("Principal Wheat") to apprise them of the situation. Principal Wheat was shocked at the allegations, reporting that Ms. Galdós-Shapiro was an excellent teacher who had no history of crossing physical boundaries with children, and who had an outstanding reputation amongst colleagues, students, and parents.

46.     Despite Principal Wheat's assurances, Dr. Dillon and Chief Storti nevertheless pushed forward. Incredibly, they inexplicably determined both that there were "exigent" or emergency circumstances related to the well-being of children that were so pressing that they warranted an immediate onsite investigation of Ms. Galdós-Shapiro's classroom and interrogation of Ms. Galdós-Shapiro herself, on the one hand, but that it was fine to wait until after the school day was over, on the other.

47.     In fact, there were no exigent circumstances whatsoever that would have caused Defendants to immediately pursue their search and investigation, but because of the nature of the allegations at issue relating to LGBTQ+ educational materials, Defendants treated this situation differently. Indeed, Officer O'Brien's search took place after school on a Friday after the students had left for the weekend. Had Defendants taken the time that Friday afternoon or over the weekend to do even the simple Google search that Chief Storti did after Officer O'Brien detained and interrogated Ms. Galdós-Shapiro and searched her classroom, or done any investigation at all of the Complainant to whom they had given full anonymity, they would have learned that there was no reason to pursue their search and investigation.

48.     In complete violation of existing policies, Dr. Dillon informed Principal Wheat that he needed to cooperate with the GBPD in the investigation and "follow their lead." Dr. Dillon also instructed Principal Wheat not to give Ms. Galdós-Shapiro advance notice of the investigation so as not to interfere with the GBPD's work. This too was a direct violation of the District's established Policy KEB.

### The GBPD's and District's Search and Interrogation of Ms. Galdós-Shapiro

49.     GBPD Officer O'Brien arrived at the Middle School in plain clothes at approximately 2:39 PM, as classes were ending for the day. Upon arrival he met with Principal Wheat, who reiterated that there had never been any complaints or concerns about Ms. Galdós-Shapiro whatsoever, that doors to classrooms remained open when students were in the classrooms, and that he did not see any truth to the allegations. During their conversation, Officer O'Brien informed Principal Wheat that there were two other faculty members named in the Criminal Complaint; Officer O'Brien did not make any attempt to interrogate them or search the areas of the Middle School in which they worked.

50.     Officer O'Brien, accompanied by Principal Wheat, walked to Ms. Galdós-Shapiro classroom to confront her, but she was not in her classroom. Principal Wheat left Officer O'Brien to look for Ms. Galdós-Shapiro. He found her in the library. Principal Wheat asked Ms. Galdós-Shapiro if she knew where the book *Gender Queer* was and explained that a parent had complained about the book to the GBPD. At no point did he explain that Ms. Galdós-Shapiro was the target of a criminal investigation or that there was an officer from the GBPD waiting for them at her classroom.

51.     Ms. Galdós-Shapiro explained that she did not know where the book was, but that she was happy to go look in her classroom.

52.     Ms. Galdós-Shapiro and Principal Wheat then walked back to her classroom to look for the book. Upon arrival, Principal Wheat entered the classroom first, followed by Ms. Galdós-Shapiro. To her complete surprise and alarm, an individual who Ms. Galdós-Shapiro would learn moments later was Officer O'Brien, followed them into the room and closed the door. Officer O'Brien then strategically placed himself between Ms. Galdós-Shapiro and the door, making it abundantly clear to Ms. Galdós-Shapiro that she was not free to leave.

53.     Officer O'Brien then informed Ms. Galdós-Shapiro that he was turning on his body camera. This too was intimidating to her and made clear that she could not leave. Although Officer O'Brien turned on his body camera, he partially blocked the camera with his sweatshirt, making clear that he used the body camera not to document his interactions with Ms. Galdós-Shapiro or for the safety of himself, Ms. Galdós-Shapiro, or Principal Wheat, but instead to intimidate Ms. Galdós-Shapiro as he initiated an unwarranted search of her classroom and wrongfully interrogated her without any cause to do so.

54.     Ms. Galdós-Shapiro was terrified. Identifying as Mexican-American and queer, not having previously been involved with the criminal justice system, not having been informed about what was happening, not having been advised of any of her rights either by the GBPD or the District, and knowing that there had recently been a police shooting of a Latino individual in a neighboring town, Ms. Galdós-Shapiro was intimidated and believed that she had to comply with the police or else there would be adverse consequences to her.

55.     Despite failing to advise her of her rights, Officer O'Brien interrogated Ms. Galdós-Shapiro with regard to her possession of the book *Gender Queer*. He declared that the book was obscene and therefore illegal—without the District ever having determined that this was the case or even having assessed the book—and dictated to Ms. Galdós-Shapiro that she

could not have the book in her classroom. In doing so, Officer O'Brien strongly suggested that Ms. Galdós-Shapiro's possession of the book was itself a criminal offense.

56.     Officer O'Brien repeatedly asked Ms. Galdós-Shapiro where the book was located, despite her numerous assertions that she did not know where the book was, but that it was not in her classroom and that another teacher may have borrowed it. While he questioned her, Officer O'Brien looked not only at Ms. Galdós-Shapiro's bookshelves, but also, without her voluntarily given permission, he rifled through papers and materials on Ms. Galdós-Shapiro's desk and other classroom tables that housed, among other things, Ms. Galdós-Shapiro's personal property, curriculum paperwork, and students' work, all without regard to Ms. Galdós-Shapiro's privacy or that of her students.

57.     Officer O'Brien finished his search and then ordered Ms. Galdós-Shapiro to go through all of the GSA bookshelves to search not only for *Gender Queer*, but also for other allegedly obscene similar material. Officer O'Brien unlawfully advised Ms. Galdós-Shapiro that she had to immediately remove all of those materials from the classroom. Officer O'Brien ordered Ms. Galdós-Shapiro to deliver *Gender Queer* to Principal Wheat when she located it, and further, repeated his claim that the book constituted material that Ms. Galdós-Shapiro could not disseminate to children. Strikingly, Officer O'Brien singled out and targeted solely LGBTQ+ materials in his orders to Ms. Galdós-Shapiro. He said nothing about the possibility of other materials in the classroom or school being obscene.

58.     Despite the claimed gravity of the allegations against Ms. Galdós-Shapiro, Officer O'Brien did not make any effort whatsoever to question Ms. Galdós-Shapiro regarding the other false claims the Complainant had made against her, having recognized the utter lack of merit to the false allegations.

59.     Officer O'Brien also did not make any attempt to question the other two faculty members that the Complainant named in his Criminal Complaint or question any of the other teachers that Ms. Galdós-Shapiro had mentioned may have borrowed the book. Officer O'Brien's decision to focus on Ms. Galdós-Shapiro, and by extension the students in the GSA, made Ms. Galdós-Shapiro feel even more threatened and wrongfully targeted.

60.     Ms. Galdós-Shapiro was left extremely shaken and distraught by the ordeal and was visibly upset. She sought comfort from two of her colleagues back in the Middle School Library after Officer O'Brien and Principal Wheat had left, breaking down in tears.

61.     While Officer O'Brien was at the Middle School, Chief Storti finally decided to research the book, *Gender Queer*. He then sent Dr. Dillon the information he found relative to the book. Even based on the biased site that Chief Storti used to research the book, it was clear that *Gender Queer* did not amount to material that would warrant a criminal investigation.

62.     The GBPD determined, on December 8, 2023, after finally inquiring about the book *Gender Queer*, that it could not pursue a criminal investigation. By this time, the GBPD had already pulled the Berkshire County District Attorney's Office (the "District Attorney's Office") into its investigation and the District Attorney himself initially too wrongly hyper-reacted to the book given its LGBTQ+ content. The District Attorney's Office, incredibly, pursued its investigation until December 14, 2023, when Dr. Dillon, days late, finally clarified to the District Attorney that the Complaint should have been handled internally, noted their policies for addressing concerns/questions about literary material, and asserted that "[the District's] existing process for evaluating it may be more relevant than a legal one." See Email attached as **Exhibit 5**. The District Attorney's Office agreed with that position. See Email attached as **Exhibit 6**. For Ms. Galdós-Shapiro, however, it was far too late.

## The Aftermath of the Investigation

63.     On December 14, 2023, Dr. Dillon wrote an email to the entire School Committee reporting on the baseless investigation. Among other things, Dr. Dillon wrote that "The GB Police Chief reached out to [him] to share that they were conducting an investigation related to a complaint about a text at the middle school[,]" that "[t]he Chief then sent an officer in plain clothes at the end of the day to try to locate that text[,]" and that "[t]he Chief is keeping who made the complaint anonymous." Dr. Dillon also noted in his email that there were policies in place to address concerns about texts (such as the concern that he and the GBPD had just criminally investigated). See Email attached as **Exhibit 7**.

64.     Dr. Dillon also sent a similar email to the entire District community, including students in the Middle School and their parents, addressing the Criminal Complaint and subsequent investigation. In his email, Dr. Dillon also addressed the controversy surrounding *Gender Queer*, its importance in gaining support for a marginalized group of students, and how many school districts in the Northeast who had assessed the propriety of the book had decided to keep the book in their schools. In sending his email, Dr. Dillon inexplicably chose not to disclose to his wide audience that neither the GBPD nor the District Attorney's Office were continuing to treat the situation as a criminal investigation. See **Exhibit 8**. Dr. Dillon's communications publicized the matter to the entire community.

65.     Around that same time, Dr. Dillon made a telephone call to Ms. Galdós-Shapiro, explaining that he was working with the GBPD and District Attorney's Office to get them to end their investigation. Dr. Dillon did not mention that he had been instrumental in pursuing the criminal investigation into Ms. Galdós-Shapiro. Dr. Dillon also did not inform Ms. Galdós-Shapiro of the other allegations the Complainant had made against her, allegations that would

become public once the GBPD released its report to the press. Nor did Dr. Dillon in this call, or indeed anyone from the District in any call, acknowledge the impact the GBPD's and District's unlawful actions had on Ms. Galdós-Shapiro personally and professionally.

### Defamation of Ms. Galdós-Shapiro

66.     Unsurprisingly, given Dr. Dillon's communications and the unprecedented nature of using the levers of law enforcement to attempt to ban a book in a school system, the GBPD's and District's criminal investigation of Ms. Galdós-Shapiro quickly gained public attention both within the local community and beyond. Numerous media outlets picked up the story, including but not limited to The Berkshire Eagle, the Boston Globe, and CNN.

67.     Despite knowing by this time that the Criminal Complaint was baseless, contained false allegations, and should never have been pursued, the GBPD remained steadfast in its attempts to maintain the anonymity of the Complainant.

68.     While committed to protecting the identity of the individual filing a false police report against Ms. Galdós-Shapiro, the GBPD did nothing to protect Ms. Galdós-Shapiro's identity. Instead, they *released* the Criminal Complaint in its unredacted form, making public Ms. Galdós-Shapiro's name, home address, and date of birth. In doing so, the GBPD ensured that Ms. Galdós-Shapiro would forever be tarred with allegations of pedophilia, grooming, and disseminating "obscene material to minors." The District took no steps to prevent this horrific defamation of their teacher. Since the time that the GBPD released Ms. Galdós-Shapiro's identity, she has been harassed and called, among other things, a "groomer" and "pedophile" by members of her community. She has been subject to threats, she and her family live in fear for their safety and have been forced to purchase video surveillance equipment, to put in place a deadbolt, to notify her neighbors and to contact the State Police Department.

69.     None of the Defendants took any actions to correct the false narrative that they had created regarding Ms. Galdós-Shapiro or to clarify that the Complainant's accusations were made in bad faith and were completely false.

70.     On the contrary, they continued to knowingly misrepresent the truth surrounding the allegations. For example, on December 16, 2023, Chief Storti and the GBPD put out a press release, no doubt attempting to mitigate the damage to their own reputations caused by their unilateral attempt to ban a book in contravention of clearly defined school policies. In that release, Chief Storti again described the Criminal Complaint, stating that it related to "concerning illustrations in a **book that was provided to students by a teacher at W.E.B. Dubois Middle School**. The illustration provided by the witness **depicted animated characters performing sexual acts on each other**[.]" See Press Release attached as **Exhibit 9** (emphasis added). Chief Storti and the GBPD made this press release public despite their full knowledge, by this point, that *Gender Queer* was not generally available to students, in fact required permission to check out, and had been checked out to only one student.

71.     In his press release, Chief Storti concealed the true nature of GBPD's investigation, writing that Officer O'Brien had simply asked Ms. Galdós-Shapiro if the book was in her classroom, and that he told her that he was not there to investigate the subject matter of the books. Chief Storti failed to address Officer O'Brien's detention of Ms. Galdós-Shapiro, interrogation of Ms. Galdós-Shapiro, and warrantless search of her classroom.

72.     It was this false narrative that has since circulated and continues to circulate through the media since the events of December 8, 2023. As several examples only:

    A.  On December 18, 2023, WGBH.com wrote a story concerning the complaint regarding "the content of a book that a teacher had made available to students at Du Bois." WGBH went on to write about "a selection from the book in

which two illustrated characters are shown engaging in oral sex." <u>See</u> Article attached as **Exhibit <u>10</u>.**

B. On December 18, 2023, the Boston Globe wrote "The Berkshire Eagle, which previously reported about the police investigation, said an English teacher had made the book available to students as a resource." The Boston Globe went on to report that the book "'was shelved with other resources for 'a club that supports LGBTQ students. The club meets in that teacher's classroom.''" In describing the book, the Boston Globe wrote that "[t]he images in question in the book, show an animated young couple engaged in a sex act[.]" <u>See</u> Article attached as **Exhibit <u>11</u>**.

C. On December 21, 2023, CNN wrote, "Police said they had received a complaint that day from someone 'who witnessed what they perceived to be concerning illustrations' in a book given to students by a teacher at the middle school." CNN further reported that the illustrations "depicted animated characters performing sexual acts on each other[.]" <u>See</u> Article attached as **Exhibit <u>12</u>**.

73.    The false narrative that Ms. Galdós-Shapiro had provided students with a book depicting sexual acts has negatively smeared her otherwise stellar reputation and sadly has created a hostile and contentious environment both at school and in the community at large.

## <u>The District's Investigation</u>

74.    As a result of the illegal investigation, Ms. Galdós-Shapiro took a leave of absence, first, to try and begin recovering from the harm and trauma caused to her by Defendants' numerous violations of her rights, and second, due to her very real fear of the still unknown individual who had levelled the false allegations against her.

75.    Specifically, because the GBPD still refused to identify the Complainant, weeks went by during which Ms. Galdós-Shapiro had no way of knowing who the individual was who had access to her classroom, her students, and herself, and what actions they might take against her next. Ms. Galdós-Shapiro was well-aware of tactics hate groups often take in targeting LGTBQ+ teachers with violence, and how controversial books are often at the center of their decision to target a specific teacher. Ms. Galdós-Shapiro's fear was only compounded because

neither the District nor the GBPD had offered Ms. Galdós-Shapiro protection (and indeed, had subjected Ms. Galdós-Shapiro to this situation).

76.     It was not until after Ms. Galdós-Shapiro expressed her fear of returning to work that, at the very least, the District agreed finally to conduct an investigation into the District's actions and the identity of the Complainant (which the GBPD still would not disclose).

77.     On or about January 16, 2024, the District formally engaged Mr. Kevin M. Kinne of Cohen Valicenti & Cook LLP ("Mr. Kinne") to conduct this investigation. Over the course of the next month, Mr. Kinne conducted a thorough investigation into the events that led up to the December 8, 2023 investigation, and drafted a comprehensive written report of his findings.

78.     In his report, Mr. Kinne identified, for the first time, the identity of the Complainant.[2] The report also confirmed numerous violations of District policies and other wrongdoing.

**The Town's Sham "Investigation" and effort to
White-Wash The Actions Of the GBPD**

79.     The Town also later, albeit reluctantly and after delay, publicized that it too would have an "independent" investigation done into the GBPD's actions on December 8, 2023.

80.     The Town engaged Comprehensive Investigations and Consulting, LLC ("CIC") to conduct that investigation. CIC released its report on or around April 29, 2024.

81.     The report is a sham. In it, CIC outlined the cursory nature of its' so-called investigation. For example, despite memorializing that the GBPD admittedly only had three photographs of excerpts from the book *Gender Queer* before launching its criminal investigation, and that the "illustrations were concerning because there was no context provided[,]" leading

---

[2] The identity of the Complainant is not being disclosed in this Complaint but is available to the Court upon request.

Chief Storti to determine that the GBPD needed to investigate the Criminal Complaint, it did not address Defendants' decision to push an investigation before gaining necessary context. CIC failed to address at all the voluminous further information that was readily available with a Google search had the GBPD, Chief Storti or Officer O'Brien taken a few minutes to research the book, through which they would have learned that there could be no basis for an investigation by law enforcement.

82.   CIC falsely and without basis determined that the Complainant somehow met the criteria to be a "confidential informant" without addressing the lack of reliability of the Complainant in any way or even seeking to obtain information regarding the Complainant from the District. CIC concluded in a cursory manner that Officer O'Brien somehow had meaningful consent from a co-conspirator, a legal impossibility, to search Ms. Galdós-Shapiro's classroom, which was not a factual finding but a legal conclusion and was not accurate. CIC failed to address Officer O'Brien's detention of Ms. Galdós-Shapiro other than to state that he somehow did not "intend" to block the doorway. Among other things, CIC failed to address his wrongful interrogation of Ms. Galdós-Shapiro, failed to address his decision to block his body camera with his shirt, failed to address his threats about a broader unlawful search or his demand that Ms. Galdós-Shapiro review all other books on the GSA bookshelf for obscene content, but not other books in her classroom. Finally, CIC failed to address the history of the anonymous Complainant as a homophobic bigot. And more.

83.   At the conclusion of its' "report," CIC simply declared Officer O'Brien and GBPD "EXONERATED." In so doing, the GBPD further defamed Ms. Galdós-Shapiro and retaliated against her.

## COUNT I

### Violation of 42 U.S.C. § 1983 – First Amendment
### (Against all Defendants)

84.     Ms. Galdós-Shapiro repeats and realleges the foregoing allegations as if fully set forth herein.

85.     The First Amendment guarantees freedom of speech in the classroom.

86.     Defendants investigated Ms. Galdós-Shapiro as a result of the allegation that she had the book *Gender Queer* in her classroom.

87.     At no time did the District ban the book *Gender Queer* or determine that it contains obscene material.

88.     Prior to December 8, 2023, numerous school districts had in fact reviewed the book to determine whether it was appropriate for the classroom and determined that it was appropriate to remain in the classroom.

89.     Nonetheless, Defendants detained and interrogated Ms. Galdós-Shapiro and searched her classroom without basis, threatened to conduct a broader search, and ordered Ms. Galdós-Shapiro to do so herself, all because of the false allegation that she had the book (despite her repeated assertions that it was not in her classroom). When Officer O'Brien was unable to find *Gender Queer*, he ordered Ms. Galdós-Shapiro to locate the book and turn it in to Principal Wheat. Officer O'Brien further ordered Ms. Galdós-Shapiro to remove any other books from her classroom with similar themes.

90.     *Gender Queer* is an award-winning memoir that cannot be considered obscene.

91.     Defendants, acting under color of law, intentionally and unlawfully intimidated and retaliated against Ms. Galdós-Shapiro, attempted to remove *Gender Queer* (and other similar books) from her classroom, and engaged in additional acts and omissions in violation of her right

to freedom of speech in the classroom, guaranteed by the First Amendment to the United States

Constitution.

92.     As a direct result of Defendants' actions, Ms. Galdós-Shapiro suffered significant

harm, including emotional harm and other damages.

## COUNT II

### Violation of 42 U.S.C. § 1983 – Fourth Amendment
### (Against all Defendants)

93.     Ms. Galdós-Shapiro repeats and realleges the foregoing allegations as if fully set

forth herein.

94.     Defendants never had any cause, let alone probable cause or reasonable suspicion,

to detain Ms. Galdós-Shapiro, interrogate her, or to search her classroom.

95.     By the time Defendants apprehended Ms. Galdós-Shapiro, escorted her to her

classroom, and closed the door to the classroom, preventing her from leaving and intimidating

her, Defendants were well aware that the allegations against Ms. Galdós-Shapiro were baseless.

96.     As to the allegations that Ms. Galdós-Shapiro allowed students to sit on her lap

and advised students to keep information from their parents, Officer O'Brien had already

questioned Principal Wheat as to the legitimacy of these allegations and Principal Wheat had

informed him that that there have never been any complaints or concerns about Ms. Galdós-

Shapiro whatsoever, that doors to classrooms remained open when students were in the

classrooms, that there were always other teachers present, and that he did not see any truth to the

allegations. The GBPD did not investigate these allegations further, and they did not investigate

them in any way when detaining Ms. Galdós-Shapiro or searching her classroom.

97.     As to the allegation that there was an "obscene" book, *Gender Queer*, in Ms.

Galdós-Shapiro's classroom, the practice of determining whether to ban a book—particularly an

award winning book present in numerous schools throughout the country, and which has been analyzed and explicitly approved by many of those school districts—is a private, policy-based matter for the District, and not for a police department, to decide.

98.     Nonetheless, Defendants, acting under color of law, intentionally and unlawfully detained  Ms. Galdós-Shapiro without probable cause to do so, intimidated her, retaliated against her, and did so without proper or lawful process, thereby depriving Ms. Galdós-Shapiro of the right to be free from unreasonable seizure as guaranteed by the Fourth Amendment to the United States Constitution.

99.     Further, Defendants, acting under color of law, unlawfully searched Ms. Galdós-Shapiro's classroom, including her own personal effects, without probable cause to do so, and without any warrant or other legal process, thereby depriving Ms. Galdós-Shapiro of the right to be free from unreasonable search as guaranteed by the Fourth Amendment to the United States Constitution.

100.    As a direct result of Defendants' actions, Ms. Galdós-Shapiro suffered significant harm, including emotional harm and other damages.

## **COUNT III**

### **Violation of 42 U.S.C. § 1983 – Fifth Amendment**
### **(Against all Defendants)**

101.    Ms. Galdós-Shapiro repeats and realleges the foregoing allegations as if fully set forth herein.

102.    As set forth above, Defendants never had any probable cause to interrogate Ms. Galdós-Shapiro in connection with their criminal investigation into the false allegations against her.

103.    Defendants, acting under color of law, intentionally and unlawfully interrogated Ms. Galdós-Shapiro, intimidated her and retaliated against her, without lawful cause to do so, and without first advising her of her right to decline to answer Officer O'Brien's questions, thereby depriving Ms. Galdós-Shapiro of the right against self-incrimination as guaranteed by the Fifth Amendment to the United States Constitution.

104.    As a direct result of Defendants' actions, Ms. Galdós-Shapiro suffered significant harm, including emotional harm and other damages.

## COUNT IV

**Violation of 42 U.S.C. § 1983 – Equal Protection Clause of the Fourteenth Amendment
(Against all Defendants)**

105.    Ms. Galdós-Shapiro repeats and realleges the foregoing allegations as if fully set forth herein.

106.    Ms. Galdós-Shapiro is a member of protected classes based on her sexual orientation and race, as well as her status as the advisor for the GSA.

107.    Prior to December 8, 2023, the GBPD and District had not initiated or participated in any criminal investigation attempting to ban a book based on its controversial topic.

108.    Here, the GBPD chose to rely on the allegations of a Complainant known to the District to have made discriminatory comments about Ms. Galdós-Shapiro herself and another Hispanic, female teacher.

109.    Moreover, in his criminal complaint, the Complainant complained about other teachers for reasons similar to his complaints about Ms. Galdós-Shapiro. Nonetheless, neither Officer O'Brien nor anyone else ever questioned or investigated those individuals.

110.    Given the disparity in how the GBPD and District treated Ms. Galdós-Shapiro and other similarly situated individuals, and the lack of any basis for this disparate treatment, the GBPD and District's actions, through Chief Storti, Officer O'Brien, and Dr. Dillon, could only have been based on Ms. Galdós-Shapiro's race, sexual orientation, and affiliation with the GSA. Defendants denied Ms. Galdós-Shapiro of her right to the equal protection of the law.

111.    As a direct result of Defendants' actions, Ms. Galdós-Shapiro suffered significant harm, including emotional harm and other damages.

## COUNT V

### Violation of G.L. c. 12 §§ 11H, 11I and Articles I and XIV of the Massachusetts Declaration of Rights
### (Against all Defendants)

112.    Ms. Galdós-Shapiro repeats and realleges the foregoing allegations as if fully set forth herein.

113.    Ms. Galdós-Shapiro enjoys a secured right to live her life free from threats, intimidation and coercion in the exercise of her right to, among other things, enjoy and defend her life and liberties and seek and obtain her safety and happiness. Ms. Galdós-Shapiro also enjoys a right to be secured from all unreasonable searches and seizures of her person, her papers, and all of her possessions without fear of discrimination, threats, intimidation or coercion. Ms. Galdós-Shapiro further enjoys the rights of freedom of speech and against self-incrimination, also without fear of discrimination, threats, intimidation or coercion. Ms. Galdós-Shapiro's rights are constitutionally secured by, among other laws, Articles I and XIV of the Massachusetts Declaration of Rights and the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

114.    Defendants have violated Ms. Galdós-Shapiro's rights. Defendants, individually and in concert with each other, violated Ms. Galdós-Shapiro's rights by pursing a false and unreliable criminal complaint against her; detaining her in her classroom while searching her classroom, including materials on Ms. Galdós-Shapiro's desk and in bookshelves; and interrogating her without notifying her of her right not to respond to Officer O'Brien's questions.

115.    Defendants violated Ms. Galdós-Shapiro's rights in order to threaten, intimidate and coerce her into removing a book, *Gender Queer* from her classroom that they found offensive—despite her legal right to have the book in the classroom—as well as to remove other LGBTQ+ books.

116.    Defendants acted in this manner despite the clear and controlling policy setting forth precisely how Defendants could challenge a book legally if they chose to do so.

117.    As a direct result of Defendants' actions, Ms. Galdós-Shapiro suffered significant harm, including emotional harm and other damages.

## COUNT VI

### Conspiracy
### (Against all Defendants)

118.    Ms. Galdós-Shapiro repeats and realleges the foregoing allegations as if fully set forth herein.

119.    Defendants' conduct, as to each of the counts set forth above, was facilitated by and carried out by Defendants joining together and agreeing to engage in an unlawful conspiracy. The conspiracy included affirmative decisions not to disclose the name of the Complainant, not to give Ms. Galdós-Shapiro notice that she would be questioned and about what she would be questioned, not to allow her to have representation when questioned, not to read her Miranda Warnings, to falsely disseminate her name and other personal information

while defaming her about grooming and acts making her out to be a sexual predator, by treating her differently because the matter involved LGBTQ+ content, and more. Defendants joined together for their unlawful purpose in a manner which uniquely allowed them to carry out their conspiracy in a way they could not have done individually.

120.    Ms. Galdós-Shapiro did in fact suffer severe emotional distress as a result of Defendants' conduct.

121.    As a direct result of Defendants' actions, Ms. Galdós-Shapiro suffered severe emotional distress, including without limitation anxiety, stress, mental anguish, living in a constant state of fear, bouts of crying, and sleeplessness.

**WHEREFORE**, Plaintiff Arantzazú Zuzene Galdós-Shapiro respectfully requests that the Court grant her the following relief:

i.   enter judgment in favor of Plaintiff and against Defendants on each of the Counts asserted herein, and award her all damages allowed by law, including compensatory and punitive damages and as determined by a jury, as well as statutory interest;

ii.  award her attorneys' fees and costs, including but not limited to pursuant to 42 U.S.C § 1983;

iii. award her attorneys' fees and costs, including but not limited to pursuant to G.L. c. 12, § 11*I*, the Massachusetts Civil Rights Act; and

iv.  grant Plaintiff such other and further relief as the Court deems just and warranted.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all counts so triable.

Respectfully submitted,

ARANTZAZÚ ZUZENE GALDÓS-SHAPIRO

By her attorneys,

/s/ Maria T. Davis
Howard M. Cooper (BBO# 543842)
hcooper@toddweld.com
Maria T. Davis (BBO # 675447)
mdavis@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
Tel: (617) 720-2626
Fax: (617) 227-5777

Dated: May 14, 2024