UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ARANTZAZU ZUZENE GALDOS-
SHAPIRO,

     Plaintiff,

     v.

THE TOWN OF GREAT BARRINGTON, et
al.,

     Defendants.

Civil Action No. 24-30070-MGM

MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTIONS TO DISMISS AND
PLAINTIFF'S MOTION FOR LEAVE TO FILE
A SECOND AMENDED COMPLAINT
(Dkt. Nos. 17, 21, & 38)

October 17, 2025

MASTROIANNI, U.S.D.J.

## I. INTRODUCTION

This case arises from a December 8, 2023 classroom interaction between Arantzazú Zuzene Galdós-Shapiro ("Plaintiff")—then a middle school teacher in Great Barrington, Massachusetts—and an officer of the Great Barrington Police Department ("GBPD"). More specifically, the GBPD, acting on a tip, initiated an investigation involving Plaintiff relative to an LGBTQ-themed book kept in her classroom.

Plaintiff's operative first amended complaint asserts five counts, sounding in both state and federal law, against an array of Defendants. The federal claims, Counts I, II, and III, assert the Town of Great Barrington, Great Barrington Police Chief Paul Storti, Great Barrington Police Officer Joseph O'Brien, and Superintendent of the Berkshire Hills Regional School District Peter Dillon, deprived Plaintiff of her rights under the First (Count I), Fourth (Count II), and Fourteenth

Amendments (Count III) to the federal constitution in violation of 42 U.S.C. § 1983.[1] The state law claims, Counts IV and V, assert these same Defendants violated the Massachusetts Civil Rights Act (Count IV) and engaged in an unlawful civil conspiracy (Count V). In addition, shortly before the court heard argument on these pending motions to dismiss, Plaintiff sought leave to file a second amended complaint, adding state law claims for intentional infliction of emotional distress (proposed Count VI) and defamation (proposed Count VII) against Defendants Dillon, Storti, and O'Brien in their official and individual capacities.[2]

Pursuant to Fed. R. Civ. P. 12(b)(6), all Defendants moved to dismiss the first amended complaint for failure to state a claim upon which relief may be granted. The individual Defendants also argue they are entitled to qualified immunity. As to the motion for leave to file a second amended complaint, all Defendants argue amendment is futile, or alternatively Plaintiff waited too long to seek leave to file another amended complaint, and they would therefore be prejudiced by the allowance of the motion to amend.

The court issued a short order granting Superintendent Dillon's motion to dismiss, granting in part and denying in part the Great Barrington Defendants' motion to dismiss, and granting in part and denying in part Plaintiff's motion for leave to amend the complaint. (Dkt. No. 56.) The court's reasoning follows.

---

[1] Although Plaintiff invokes federal question jurisdiction under 28 U.S.C. § 1331, jurisdiction over the state law claims is also appropriate under 28 U.S.C. § 1332(a)(1), as Plaintiff is a citizen of Pennsylvania, while the Defendants are citizens of Massachusetts. *See Connectu LLC v. Zuckerberg,* 522 F.3d 82, 91 (1st Cir. 2008) (noting diversity of citizenship is determined as of the time the complaint is filed); *Disaster Sols., LLC v. City of Santa Isabel, Puerto Rico,* 21 F.4th 1, 5 (1st Cir. 2021) (illustrating a municipality, unlike a state, is a citizen for diversity purposes).

[2] Defendants moved to dismiss the official capacity claims against the individual Defendants. As Plaintiff did not oppose these arguments, the court deems the official capacity claims abandoned.

## II.    BACKGROUND[3]

### A.  The Teacher

Beginning in 2018, Plaintiff worked as an English Language Arts teacher at Du Bois Regional Middle School in Great Barrington, Massachusetts.[4] In 2021, she was named an instructional lead for the middle school, a position of increased responsibility. As an instructional lead, Plaintiff focused on implementing innovative instructional and professional development practices. Plaintiff also served as a "crew coordinator," a role that allowed her to work with students to develop academic and social-emotional skills. She was well-liked by students, parents, and her peers, as reflected both in her steady promotions to positions of increasing responsibility and by Superintendent Dillon's 2023 decision to appoint her to the search committee for Du Bois's new principal.

Plaintiff's contributions to the Du Bois community were not limited to the classroom. Dillon appointed her advisor to the school's local chapter of the Gender and Sexuality Alliance ("GSA"). Although paid, this position was primarily administrative, as she oversaw the local branch of "a national network of student-run organizations which unite LGBTQ+ and allied youth in an effort to build their community and to enable them to organize around issues impacting them in their schools and communities." (Dkt. No. 16 ¶ 22.) It was Plaintiff's job to "facilitate a space and opportunity for the students themselves to undertake activities." (*Id.* ¶ 23.) She therefore opened her classroom during the seventh and eighth grade lunch and recess periods each Friday for the GSA's student run meetings. Plaintiff additionally acted as faculty liaison to the school's student run "Black, Indigenous, and People of Color Club," a group that met during the weekly Friday "crew period."

---

[3] Unless otherwise noted, all factual allegations are drawn from Plaintiff's operative first amended complaint. (Dkt. No. 16.) The factual allegations in Plaintiff's proposed second amended complaint are essentially identical. (Dkt. No. 38-1.)

[4] Plaintiff is of Mexican American heritage and identifies as a member of the LGBTQ+ community.

### B. The Book

*Gender Queer* is a graphic memoir addressing "issues of self-identity, the confusion of adolescence, and coming out as nonbinary." (*Id.* ¶ 27.) According to the complaint, *Gender Queer* has received several awards for its discussion of "the important issue of gender identity and confronting opposition to the reality of that issue." (*Id.* ¶ 26.) *Gender Queer* has also received substantial backlash from groups opposed to the presence in the classroom of books addressing LGBTQ issues or acknowledging the existence of LGBTQ individuals.

*Gender Queer* is not part of the curriculum at Du Bois. It is not required to be kept in any classroom, nor must it be read by any student who does not wish to do so. Rather, Plaintiff kept a personally owned copy of the book in her classroom. At one point in time, Plaintiff loaned the book to Du Bois's library for exhibition during a "Banned Book Week," but normally the book resided on a special bookshelf within her room dedicated to the GSA. To access the book, an interested student was required to obtain permission from Plaintiff. During her tenure at Du Bois, only one student sought access to the book. This student and the student's parents were well known to Plaintiff, and it was Plaintiff's understanding that the student's parents approved of their child's access to the book.

Before December 8, 2023, there was never a challenge to the presence of *Gender Queer* in Plaintiff's classroom, despite the Berkshire Hills Regional School District providing a formal mechanism for an individual or group to challenge the presence of a book in a classroom. (Dkt. No. 16-1.) Nothing in this school district formulated policy assigned the GBPD a role in determining Du Bois's curriculum or analyzing the suitability of library books. The policy, rather, indicated "[t]he School Committee will not permit any individual or group [other than the School Committee] to exercise censorship over instructional materials and library collections." (Dkt. No. 16-1 at 2.)

### C. The Investigation

In early December of 2023, Great Barrington Police received a visit from "an individual

wishing to remain anonymous." (Dkt. No. 16-2 at 2.) Defendant O'Brien interviewed this person and, as requested by this person, treated them with complete public anonymity. This tipster, subsequently identified as the night janitor at Du Bois, provided O'Brien with pictures he had taken of illustrations in *Gender Queer*. (*Id.*; Dkt. No. 16-3.) These images depicted two characters engaging in sexual acts. (Dkt. No. 16-3.) According to his written report, O'Brien believed these images "may be in violation of" Mass. Gen. Law ch. 272, § 29 (Dkt. No. 16-2 ¶ 2), but this report did not reference Section 29's plain text, which includes a defense regarding school employees and educational involvement. Mass. Gen. Law ch. 272, § 29; *see also* Mass. Gen. Laws ch. 272, §§ 28C, 28D, 28F. As an additional source of concern to O'Brien, the tipster stated he had "observed a student sitting on the teachers [*sic*], [Plaintiff], lap" and "was concerned about this conduct as well as the teacher and a few other staff meeting with students in private, and discussing subjects related to LGBTQ material and telling them not to tell their parents about it." (Dkt. No. 16-2 ¶ 1.)

There is nothing in O'Brien's report (attached to the complaint) indicating he validated the tipster's reliability or inquired as to how this person knew Plaintiff or came upon this information. According to the complaint, had he inquired into this information, O'Brien would have learned the tipster had a lengthy history of making homophobic and racist comments, in general, and targeted remarks toward Plaintiff, in particular. (Dkt. No. 16 ¶¶ 30, 35-36.) O'Brien allegedly would have learned that, just a few months prior, the tipster had been admonished by school officials for telling another teacher Plaintiff was "teaching kids how to have gay sex." (*Id.* ¶ 36.) He also allegedly would have learned the tipster had been suspended for two days by school officials for a tirade directed at another Hispanic teacher. (*Id.*) Finally, O'Brien could have learned the tipster's allegations, especially those relating to observing Plaintiff's interactions with students, were not logistically possible, as the tipster was the night janitor and did not work during school hours. (*Id.* ¶ 32.)

After receiving the tipster's information, O'Brien called Chief Storti to discuss the allegations.

5

(*Id.* ¶ 40.) As relevant to the court's later analysis, Storti, in addition to serving as police chief, is alleged in the complaint to have been the parent of children attending Berkshire Hills Regional schools. (*Id.* ¶¶ 42-43.) In his capacity as a parent, Storti urged Superintendent Dillon to cease celebrating "Pride Month." (*Id.*) More specifically, Storti allegedly played a major role in preventing the reading of LGBTQ-related definitions during morning announcements. (*Id.*) The complaint alleges chief Storti listened to O'Brien's recitation of the tipster's accusations and, based on what was said, decided to notify Superintendent Dillon. (*Id.* ¶ 40.)

Storti told Dillon that the police department had received a complaint against Plaintiff. (*Id.*) As alleged, Storti informed Dillon that *Gender Queer* contained "pornographic illustrations." (*Id.*) He did not inform Dillon of the identity of the tipster. Dillon expressed surprise, as he knew Plaintiff's reputation in the community was one of excellence as a teacher. (*Id.* ¶ 44.) This finding was echoed by Du Bois's principal—Miles Wheat—during a brief call with Storti. (*Id.* ¶¶ 44, 47.) During this call, Wheat told Storti that Plaintiff had an outstanding reputation and no history of crossing boundaries with students. (*Id.*) Storti listened to Dillon and Wheat, but he and Dillon concluded there were "exigent" circumstances requiring an immediate onsite investigation of Plaintiff. (*Id.* ¶ 47) Storti and Dillon therefore agreed to send O'Brien to the school. Dillon told Principal Wheat to cooperate with the investigation. (*Id.*) Dillon also directed Wheat not to inform Plaintiff that the police were on their way. (*Id.*)

### D. The School Visit

Around 2:40 p.m., O'Brien arrived at the school. (*Id.*) O'Brien was met there by Principal Wheat, who again reiterated he had no reason to suspect Plaintiff engaged in any wrongdoing.[5] While

---

[5] After meeting with Wheat, O'Brien limited his investigation to the possible obscenity contained in books kept in the classroom, as he made no efforts to question Plaintiff regarding the tipster's other allegations, including that students sat on her lap. (*Id.* ¶ 3, 53, 56, 95.) Plaintiff alleges in the

O'Brien and Wheat initially went to Plaintiff's classroom, they realized she was not there, prompting Wheat to separate from O'Brien to locate Plaintiff. Wheat found Plaintiff in the library. He then asked if she knew where to find her copy of *Gender Queer*. Plaintiff indicated she could not recall where the book was, but she was happy to go look in her classroom.

Upon arriving in her classroom, Plaintiff and Wheat were followed by O'Brien, who closed the door and positioned himself between Plaintiff and the door. O'Brien, who was in plain clothes, activated his body camera and began to ask Plaintiff about the book.[6] Specifically, O'Brien asked if Plaintiff had ever read the book; she responded she had when it first came out but had not recently reviewed it.[7] O'Brien indicated he was not there because of the "general idea" of what the book was about, but rather because he thought the book could not be presented to children under age eighteen in the school.

As the discussion progressed, it quickly became clear the book was not in the classroom, and Plaintiff did not know where exactly the book was located.[8] O'Brien nevertheless expanded his questioning, asking Plaintiff if any of her other books had "similar images." Plaintiff stated she was unaware of any other such images, but she offered to let O'Brien flip through any of the specific books

---

complaint that O'Brien "recognized the utter lack of merit to those false allegations," which explains this lack of questioning of such serious allegations. (*Id.* ¶ 56.)

[6] The complaint references the body camera footage of the search. As Defendants note, this footage has become publicly available. The court has reviewed the footage, but found it to be of limited visual utility, as the video camera appears to be under a piece of clothing and O'Brien's hand can be seen moving the clothing to turn the camera on and off. With respect to the audio, the court found nothing in the video materially contradicted any of the allegations of the complaint. However, to the extent the body camera footage provides a useful supplement to the complaint, the court will refer to certain parts of the recording in this factual narrative.

[7] O'Brien did not advise Plaintiff of her *Miranda* rights.

[8] The operative complaint does allege that O'Brien was made aware of "other teachers in the Middle School who housed *Gender Queer* in their classrooms that are not part of the LGBTQ+ community . . . but at no point were their classrooms searched nor were they interrogated." (*Id.* ¶ 31.)

he might want to review. Rather than engage in a book-by-book search, O'Brien ordered Plaintiff to remove any such books from her classroom. At this time, he also reiterated that the images constituted "material you cannot disseminate to children," before proceeding to look through Plaintiff's classroom. After approximately five and half minutes, O'Brien again told Plaintiff she should "make it a point to go through the books [in the classroom]" to look for other books with similar, purportedly obscene images which, as he explained, should not be disseminated to children. The entire interaction lasted approximately eight minutes but, in the end, the book was not found.

Following the classroom encounter with O'Brien, Plaintiff retreated to the school library, where, visibly shaken by the encounter, she began to cry in the presence of several of her colleagues. Meanwhile, O'Brien spoke with Storti. After this conversation, O'Brien discussed the matter with an Assistant District Attorney for Berkshire County, where Great Barrington is located.

### E.  The Aftermath

From December 8 to December 14, the Berkshire County District Attorney's Office maintained an open investigation into the book (and Plaintiff). On December 14, Superintendent Dillon contacted the District Attorney by email. (Dkt. No. 16-5.) In the email, Superintendent Dillon explained his view that it was inappropriate to turn *Gender Queer*'s presence in a classroom into a criminal investigation, as the school had specific policies that needed to be followed when challenging a book. He further noted that, while the book was controversial, it had won awards, and "[m]any would argue that this graphic novel is simply literature and art and should be protected." (*Id.* at 2-3.) The District Attorney's Office subsequently agreed to drop the investigation and return the matter to the school, as it had determined "the book *Gender Queer* in an unaltered state is not obscene, pornographic material." (Dkt. No. 16- 6 at 1.)

Also on December 14, Superintendent Dillon sent two emails. In the first, addressed to the School Committee, he reiterated his belief that law enforcement should not be involved in any decision

regarding *Gender Queer*'s status in the school district. (Dkt. No. 16-7.) Dillon further indicated Storti was still keeping the tipster's identity a secret. In the second email, addressed to the students and parents of the school district, Dillon let the entire community know police had been dispatched to Du Bois because of a book. (Dkt. No. 16-8.) The second email also reaffirmed that the district had a process to challenge a book. Finally, Dillon called Plaintiff to tell her he was working to have the investigation quashed. Dillon did not, however, inform Plaintiff that she had been accused of allowing children to sit on her lap, nor did Dillon explain she had been personally accused of disseminating obscene material to minors by the tipster.

The December 14 email from Superintendent Dillon to the parents and students of the district triggered immediate, intense national media scrutiny. In a bid to get ahead of this scrutiny, the GBPD released an unredacted copy of their investigative report to the public, thereby exposing Plaintiff's name, date of birth, and home address. The police did not simultaneously release the identity of the tipster, who maintained his status as a confidential informant. Once Plaintiff's personal information was released to the public, she was immediately subjected to a wave of harassment. This harassment included threats and repeated accusations that she was a "pedophile" or a "groomer." Plaintiff, fearing for her safety and that of her family, was forced to buy security equipment, add a deadbolt, and contact her neighbors asking they call police if they saw anything suspicious. Ultimately, Plaintiff took a leave of absence.

On December 16, in a second effort to confront the growing media attention, Storti issued a press release describing his version of the events leading up to O'Brien's visit to Plaintiff's classroom. (Dkt. No. 16-9.) This release read as follows:

> On December 8, 2023 [t]he Great Barrington Police Department received a complaint from a person who witnessed what they perceived to be concerning illustrations in a book that was provided to students by a teacher at W.E.B. Dubois Middle School. The illustration provided by the witness depicted animated characters performing sexual acts on each other. Because this complaint was made directly to the police department, we are obligated and have a duty to examine the complaint further. Thanks to our

established relationship with the school, we were able to carefully work together to investigate this situation. This involved immediate notification of the Superintendent and Principal of the middle school. Because we were only provided a single image of the illustration, it was important to identify and examine the material that was reported to us. Working together, it was decided that the department would send an officer toward the end of the day in plain cloth[e]s to be escorted to the classroom and to see if the book containing the illustration could be located. After a brief conversation with the teacher, the officer was advised that the book in question was not there and could not be accounted for at that time. The officer advised the principal and teacher, that we were not there to investigate the subject matter of any books. As a procedure in sensitive or complex investigations, the police notified the District Attorney's Office. Once the necessary information was gathered, it was determined that it is a matter to be managed within the Berkshire Hills Regional School District. The Great Barrington Police Department is dedicated to the safety of all people, especially children, and we take all complaints seriously.

(*Id.*) News stories relying on this press release were published nationally by, among other entities, WGBH.com, the Boston Globe, and CNN. (Dkt. Nos. 16-10, 16-11, and 16-12.)

On January 16, 2024, the school district decided to commission an independent investigation into the events surrounding the December 8, 2023 incident. Attorney Kevin Kinne, of the law firm Cohen Valicenti & Cook LLP, was hired to prepare this report. As the complaint notes, over the course of a month, Attorney Kinne conducted a "thorough" review of the situation. (Dkt. No. 16 ¶ 76.) His detailed report was critical of what transpired. Similarly, the GBPD hired Comprehensive Investigations and Consulting, LLC to conduct their own independent investigation. The complaint characterizes the police funded investigation, which produced results contrary to the school district's investigation, as a "White-Wash," (*id.* at 27), which made preordained findings that O'Brien and the GBPD were "EXONERATED." (*Id.* ¶ 81.)

### III.   LEGAL STANDARDS

#### A.   Rule 12(b)(6)

As this matter is before the court on Defendants' motions to dismiss pursuant to Rule 12(b)(6), the court applies the standard set forth in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft*

*v. Iqbal*, 556 U.S. 662 (2009). Therefore, the complaint must allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. The court must credit well-pleaded factual allegations as true and draw all reasonable inferences from those facts in the non-moving party's favor. *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 36 (1st Cir. 2013). "Well-pleaded facts must be non-conclusory and non-speculative." *Barchock v. CVS Health Corp.*, 886 F.3d 43, 48 (1st Cir. 2018) (internal quotation marks omitted). For a claim to proceed, the complaint must allege enough facts to plausibly establish each material element of the claim and "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc) (citing *Twombly*, 550 U.S. at 555). The court's review is typically limited to the allegations in the complaint, but it "may [also] consider implications from documents attached to or fairly incorporated into the complaint," *Barchock*, 886 F.3d at 48, as well as "matters of public record, and other matters susceptible to judicial notice," *Newton Covenant Church v. Great Am. Ins. Co.*, 956 F.3d 32, 35 (1st Cir. 2020).

### B.  Motion to Amend

Under Fed. R. Civ. P. 15(a)(2), "a party may amend its pleading only with the opposing party's written consent or the court's leave," but "[t]he court should freely give leave when justice so requires." *Id.* Despite this broad language, "[t]his rule does not mean that a trial court must mindlessly grant every request for leave to amend." *Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 60 (1st Cir. 2013) (internal quotation marks omitted). Rather, leave to amend is appropriately denied when "the request

is characterized by undue delay, bad faith, futility, [or] the absence of due diligence on the movant's part." *Id.* at 61 (alteration in original and internal quotation marks omitted).

## IV.  DISCUSSION

### A.  Section 1983 Claims

#### 1.  *Unlawful Search*

As a prerequisite to bringing a Section 1983 claim sounding in the Fourth Amendment's prohibition on unreasonable searches, a plaintiff must "claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action." *Harper v. Werfel*, 118 F.4th 100, 107 (1st Cir. 2024) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)), *cert. denied sub nom. Harper v. Faulkender*, No. 24-922, 2025 WL 1787823 (June 30, 2025). Inquiry into the existence of a reasonable expectation of privacy contains both objective and subjective elements, as a plaintiff must allege "an actual (subjective) expectation of privacy" and "the individual's expectation, viewed objectively, [must be] justifiable under the circumstances." *Id.* (internal quotation marks omitted and alteration in original).

In this case, the viability of Plaintiff's unlawful search claim turns on whether she has a recognized expectation of privacy in her classroom. Generally, "the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis." *O'Connor v. Ortega*, 480 U.S. 709, 718 (1987). "Individuals do not lose Fourth Amendment rights merely because they work for the government instead of a private employer," but "[t]he employee's expectation of privacy must be assessed in the context of the employment relation," as "some government offices may be so open to fellow employees or the public that no expectation of privacy is reasonable." *Id.* at 717-18; *see also Alinovi v. Worcester Sch. Comm.*, 777 F.2d 776, 782 (1st Cir. 1985) ("Just as students are protected by the Fourth Amendment, teachers are also entitled to the amendment's protection against unreasonable

searches by school officials."). A public employee therefore has a reasonable expectation of privacy in private areas of the workplace—such as desk drawers and file cabinets—but typically lacks a reasonable expectation of privacy in those areas of the workplace that are more open to the public or fellow employees. *O'Connor*, 480 U.S. at 718-19; *see also Vega-Rodriguez v. Puerto Rico Tel. Co.*, 110 F.3d 174, 179 (1st Cir. 1997) ("Applying *O'Connor* in various work environments, lower federal courts have inquired into matters such as whether the work area in question was given over to an employee's exclusive use . . . the extent to which others had access to the work space . . . the nature of the employment . . . and whether office regulations placed employees on notice that certain areas were subject to employer intrusions . . . ." (internal citations omitted)).

Applying *O'Connor* and its progeny to this case, the court concludes Plaintiff had a reasonable expectation of privacy in her desk drawers, file cabinets, and enclosed personal items such as a bag, backpack, or briefcase in the classroom. *See O'Connor*, 480 U.S. at 716-19; *see also United States v. Mancini*, 8 F.3d 104, 108-10 (1st Cir. 1993); *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 181-83 (2d Cir. 2004) (accepting that teacher could have some degree of reasonable expectation of privacy in his classroom); *Khachatourian v. Hacienda La Puente Unified Sch. Dist.*, 572 F. App'x 556, 558 (9th Cir. 2014) ("We nevertheless assume arguendo that Khachatourian had a reasonable expectation of privacy in the contents of his [classroom] desk drawers."); *Gillard v. Schmidt*, 579 F.2d 825, 828-29 (3d Cir. 1978) (holding that school guidance counselor had reasonable expectation of privacy in desk). Plaintiff does not, however, have a reasonable expectation of privacy in the entire classroom itself, as "classrooms are open to students, other faculty, administrators, substitute teachers, custodians, and on occasion, parents." *Plock v. Bd. of Educ. of Freeport Sch. Dist. No. 145*, 545 F. Supp. 2d 755, 758 (N.D. Ill. 2007); *see also Khachatourian*, 572 F. App'x at 558 ("Khachatourian's expectation of privacy in his classroom was therefore not a reasonable one . . . ."); *Peters v. Mundelein Consol. High Sch. Dist. No. 120*, No. 21 C 0336, 2022 WL 393572, at *12 (N.D. Ill. Feb. 9, 2022) ("Given this, numerous courts have

concluded that public school teachers lack any privacy expectation in their classroom. This court has not found a single opinion to the contrary."); *Marriott v. USD 204, Bonner Springs-Edwardsville*, 289 F. Supp. 3d 1235, 1240 (D. Kan. 2017) (same). This court agrees with the well-reasoned analysis of *Plock*, *Peters*, and *Marriott*, and concludes there is no reasonable expectation of privacy in the entire classroom because of the inherently open nature of the space.

Turning to the complaint, there are no well-pled factual allegations supporting an inference O'Brien searched those areas of the classroom entitled to a reasonable expectation of privacy. Rather, the complaint alleges O'Brien "looked" at Plaintiff's "bookshelves," then "rifled through papers and materials on Ms. Galdós-Shapiro's desk and other classroom tables that housed, among other things, Ms. Galdós-Shapiro's personal property, curriculum paperwork, and students' work." (Dkt. No. 16 ¶ 54.) Classroom bookshelves are not akin to drawers or file cabinets, as they are visible to all who enter the room. It is also widely understood students (or other faculty) will remove (and read) the contents of these shelves; this common understanding of a bookshelf's purpose further underscores the lack of a reasonable expectation of privacy, as "persons cannot reasonably maintain an expectation of privacy in that which they display openly." *United States v. Gamache*, 792 F.3d 194, 199 (1st Cir. 2015) (internal quotation marks omitted). Plaintiff similarly lacks a reasonable expectation of privacy in classroom tables, as the material on these tables is visible to anyone entering the room. To the extent anyone possesses a privacy interest in a student's desk, it is the student, not the teacher. Lastly, the material on Plaintiff's desk was also exposed to public view, meaning this area of her desk is not entitled to a reasonable expectation of privacy, as any student or visitor to the classroom would have been able to view any material on the desk which was allegedly "rifled" through. It is unreasonable to view papers left out on a desk as having a recognized privacy interest, especially when school children routinely move through the space.

Accordingly, Plaintiff has not plausibly alleged she was entitled to a reasonable expectation of

privacy in the area searched by O'Brien. Count II, in so far as it alleges an unlawful search, is therefore dismissed for failure to state a claim.

### 2. *Unlawful Seizure of the Person*

#### a. *Constitutional Violation*

The Fourth Amendment does not just protect against unreasonable searches, it also prohibits unreasonable seizures of the person. *Torres v. Madrid*, 592 U.S. 306, 311 (2021). "A Fourth Amendment seizure occurs when a police officer 'has in some way restrained the liberty of a citizen' through 'physical force or show of authority.'" *United States v. Camacho*, 661 F.3d 718, 725 (1st Cir. 2011) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, n. 16 (1968)). As relevant here, "a verbal show of authority that would compel a reasonable person to comply" becomes a seizure when "the person submits to the show of authority by complying with the officer's instruction." *United States v. Dubose*, 579 F.3d 117, 121 (1st Cir. 2009) (internal quotation marks omitted); *United States v. Smith*, 423 F.3d 25, 28-29 (1st Cir. 2005) (explaining that seizure analysis must be based on the totality of the circumstances). "Once the person complies, [her] liberty has been restrained and [she] is seized under the Fourth Amendment." *Dubose*, 579 F.3d at 121 (alterations added). At bottom, "[c]ourts evaluate the 'coercive effect of [an] encounter' by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" *United States v. Sierra-Ayala*, 39 F.4th 1, 13 (1st Cir. 2022) (quoting *Camacho*, 661 F.3d at 725).

Here, the complaint plausibly alleges Plaintiff was seized by O'Brien.[9] While there is no allegation O'Brien physically touched Plaintiff, he closed the door to Plaintiff's classroom and placed himself between Plaintiff and the exit and remained in front of the way out for the better part of the

---

[9] "[B]rief seizures are seizures all the same." *Torres v. Madrid*, 592 U.S. 306, 318 (2021) (alteration added). The "fleeting nature" of the seizure "may inform what damages a civil plaintiff may recover," but a fleeting seizure is no less a seizure than an arrest leading to incarceration. *Id.*

interaction. O'Brien never informed Plaintiff she was free to leave. Instead, he told Plaintiff that he

was turning on his body camera, before indicating he was there to investigate her possession of *Gender*

*Queer*. Having viewed this body camera footage, the court finds it is plausibly alleged that the

circumstances of the interaction could support a factfinder in concluding an investigatory detention

occurred. Specifically, O'Brien's reprimanding tone and reliance on inquisitorial statements, when

considered in conjunction with his not indicating Plaintiff was free to leave, were consistent with a

seizure. The interaction and its subject matter had accusatorial qualities which suggest a reasonable

person in Plaintiff's position would not feel that walking away from the situation was an option. This

is especially true given that the police officer was accompanied by the principal of Plaintiff's school,

and the officer proceeded to ask questions strongly implying Plaintiff was responsible for distributing

obscene images to children. The complaint plausibly alleges a reasonable person in such a scenario

would conclude that not only their liberty, but also their livelihood, would be threatened if they did

comply with the officer's request. Viewed in a light most favorable to Plaintiff, O'Brien's alleged

behavior and demeanor plausibly indicate the interaction was an investigatory detention. Plaintiff,

moreover, was compliant with O'Brien's verbal show of authority, meaning it is plausible to infer her

liberty was restrained and a seizure was effectuated under the Fourth Amendment.[10] *See Camacho*, 661

---

[10] In arguing Plaintiff was not seized, O'Brien and Storti rely on case law discussing the meaning of
"custody" for purposes of *Miranda* analysis under the Fifth Amendment. *See, e.g., Oregon v. Mathiason,*
429 U.S. 492, 494-96 (1977); *United States v. Monson*, 72 F.4th 1, 10 (1st Cir.), *cert. denied,* 144 S. Ct. 367
(2023); *United States v. Hinkley*, 803 F.3d 85, 90 (1st Cir. 2015); *United States v. Hughes,* 640 F.3d 428,
434-35 (1st Cir. 2011); *Locke v. Cattell*, 476 F.3d 46, 51-52 (1st Cir. 2007) (all discussing *Miranda*).
Although a *Miranda*-related analysis can provide some indirect guidance, the standards governing a
seizure for Fourth Amendment purposes and a finding of custody for Fifth Amendment purposes are
not the same. *See Berkemer v. McCarty*, 468 U.S. 420, 436-37 (1984) (observing a traffic stop is a seizure
for Fourth Amendment purposes but it is not automatically a custodial interrogation for Fifth
Amendment purposes); *see also United States v. Streifel*, 781 F.2d 953, 960-61 (1st Cir. 1986) (interpreting
*Berkemer* in the same manner); *United States v. Widi*, 686 F. Supp. 2d 107, 112 (D. Me. 2010), *as
corrected* (Mar. 4, 2010) (collecting cases from the Second, Seventh, Ninth, and Tenth Circuits holding
the standards are different).

F.3d at 726 ("And Camacho submitted to Officer Sousa's show of authority by responding to his questions, at which point 'his liberty ha[d] been restrained and he [was] seized under the Fourth Amendment.'" (quoting *Dubose,* 579 F.3d at 121); *see also Brendlin v. California*, 551 U.S. 249, 254 (2007) ("A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." (citing *California v. Hodari D.,* 499 U.S. 621, 626, n. 2 (1991)). Viewed in a light most favorable to Plaintiff, O'Brien's alleged behavior and demeanor, and Plaintiff's response thereto, plausibly indicate Plaintiff was seized under the Fourth Amendment.

Despite concluding Plaintiff has plausibly alleged she was seized, the court's analysis cannot end there, as the Fourth Amendment "does not prohibit all searches and seizures but, rather, only those that are unreasonable." *United States v. Carmona*, 103 F.4th 83, 90 (1st Cir. 2024) (internal quotation marks omitted). A seizure is generally reasonable under the Fourth Amendment when it is backed by probable cause. *See United States v. Centeno-Gonzalez*, 989 F.3d 36, 44-45 (1st Cir. 2021). "Probable cause exists when 'the facts and circumstances as to which police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found." *United States v. Dion*, 859 F.3d 114, 131-32 (1st Cir. 2017). Not all seizures, however, require probable cause to qualify as reasonable. *See Terry v. Ohio*, 392 U.S. 1, 21-25 (1968). The Supreme Court previously ruled that while the Fourth Amendment's protections "extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest," these brief investigatory stops are reasonable so long as "the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (first citing *Terry*, 392 U.S. at 9, and then quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). To "pass[] constitutional muster," a *Terry* stop requires officers have "more than a naked hunch"; they must, rather, have a "particularized and objective" basis to suspect the seized individual of involvement in

criminal conduct. *United States v. Carmona*, 103 F.4th 83, 90 (1st Cir. 2024).

According to the complaint and the documents annexed thereto, while there were originally two asserted bases for the criminal investigation—the allegation that children sat on Plaintiff's lap, and the images of *Gender Queer*—the focus of the investigation narrowed to the book by the time Officer O'Brien entered Plaintiff's classroom, as he questioned her "only with regard to her possession of . . . *Gender Queer*." (Dkt. No. 16 ¶ 53; *see also id.* ¶ 3 (alleging GBPD "had *already dismissed*" the lap sitting and other allegations "as not worthy of investigating *before* Officer O'Brien ever entered [Plaintiff's] classroom and before he ever questioned [her]"); *id.* ¶ 95 ("The GBPD did not investigate these allegations further, and they did not investigate them in any way when detaining [Plaintiff] or searching her classroom . . . .").) The court will therefore limit its analysis to whether O'Brien was justified in seizing Plaintiff's person based on only the book under either the probable cause or *Terry* reasonable suspicion standards.

First, although the tipster's veracity, reliability, and basis for knowledge were more important as to the lap-sitting allegations, the reliability of the tipster was also relevant in the context of the allegations regarding the book. Information from a confidential informant can, in the proper circumstance, furnish probable cause for the seizure of a person when the informant is of "proven reliability." *See United States v. Vasquez*, 544 F.3d 348, 350 (1st Cir. 2008). "An officer may [also] rely upon an informant's tip to establish reasonable suspicion only if the information carries sufficient indicia of reliability to warrant acting upon it." *United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004) (quoting *Alabama v. White,* 496 U.S. 325, 328 (1990)) (alteration added). "That determination entails an examination of all the circumstances bearing upon the tip itself and the tipster's veracity, reliability, and basis of knowledge," *id.*, including whether the tip has been "sufficiently corroborated," *United States v. Jones*, 700 F.3d 615, 622 (1st Cir. 2012). Here, there were obvious reasons to doubt the tipster's reliability and no corroboration of the tipster's information. In fact, as alleged in the complaint, Officer

O'Brien "had already dismissed as not worth investigating" the graver allegations the tipster made against Plaintiff, "having recognized the utter lack of merit to those false allegations." (Dkt. No. 16 ¶¶ 3, 56, 95.) This recognition as to the lack of reliability of the tipster's other allegations—themselves undermined by the fact that the tipster, a nighttime janitor, did not work during school hours and thus could not have witnessed any interactions between Plaintiff and her students—should have also informed O'Brien's investigation into the tipster's allegations regarding the book. *See United States v. Monteiro*, 447 F.3d 39, 46 (1st Cir. 2006) ("When an initial police investigation into a tip of illegal activity reveals factors inconsistent with the tip, the reasonable suspicion analysis must take these indicia of unreliability into account along with any indicia of reliability."). Moreover, O'Brien's brief discussions with Superintendent Dillon and Principal Wheat further undermined the tipster's allegations, suggesting they were nothing but "gossip or innuendo." *Romain,* 393 F.3d at 71. When an officer "indiscriminately credit[s] gossip or innuendo" there is no basis for reasonable suspicion, let alone support for probable cause. *Id.*

Second, the two images from *Gender Queer* furnished no probable cause or reasonable suspicion for several reasons. As an initial matter, Mass. Gen. Law ch. 272, § 29 immunized Plaintiff from prosecution in the context of this case.[11] While "the general rule [is] that an officer need not resolve possible defenses or conflicting accounts" when considering probable cause or reasonable suspicion, "there are times when the facts made known to the officer, by the complainant or otherwise, combined with the circumstances under which those facts were made known, would cause a reasonable officer

---

[11] Defendants' briefing references Mass. Gen. Law ch. 272, § 28, prohibiting the distribution of harmful matter to minors, but this was explicitly not the statute O'Brien was relying on. (Dkt. No. 16-2 at 2.) Regardless, Section 28 contains the same educational use defense contained in Section 29 and a cursory glance at the book reveals that it is excluded from Section 31's definition of "harmful to minors" because it has artistic and literary merit, meaning O'Brien lacked probable cause or reasonable suspicion even under this provision. *Cf. Com. v. Militello,* 848 N.E.2d 406, 412-13 (Mass. App. Ct. 2006) (reversing adult's conviction for showing adolescents a Playboy magazine).

to pause before concluding that there is a fair probability that the accused individual had committed a crime." *Holder v. Town of Sandown*, 585 F.3d 500, 505-06 (1st Cir. 2009) (alteration added). This is such a time, as the Supreme Court has consistently warned that the constitutionally perilous nature of an investigation into a book warrants extreme caution on the part of law enforcement before proceeding because "[t]he Bill of Rights was fashioned against the background of knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression." *Roaden v. Kentucky*, 413 U.S. 496, 506 (1973) (internal quotation marks omitted); *see also Lee Art Theatre, Inc. v. Virginia*, 392 U.S. 636, 637 (1968). Massachusetts law further recognizes this inherent danger of constitutional harm by requiring that a Justice of the Superior Court declare a book obscene—a step not taken—as a condition precedent to even initiating a prosecution under the statutory provision cited as a basis for action in the police report. *See* Mass. Gen. Laws ch. 272, §§ 28C, 28I; *Commonwealth v. Zone Book, Inc.*, 361 N.E.2d 1239, 1241-43 (Mass. 1977); *see also Com. v. 707 Main Corp.*, 357 N.E.2d 753, 758 (Mass. 1976); *Dist. Att'y for Hampden Dist. v. 355 Publications*, 616 N.E.2d 493, 494 n. 2 (Mass. App. Ct. 1993). Given the stringent safeguards embedded in the statutory scheme, the facts relayed to O'Brien by the tipster, and the information he gleaned during his investigation, the complaint plausibly alleges any reasonable officer should have understood there was no basis to suspect Plaintiff of violating Section 29. In addition, the cover of the book (provided to O'Brien by the tipster) displayed that it had received a national prize from the American Library Association, thereby indicating that it had literary and artistic merit regarding a controversial subject. Accordingly, Plaintiff has alleged a plausible Fourth Amendment claim against O'Brien for seizing Plaintiff's person without probable cause or reasonable suspicion.

Plaintiff has also plausibly alleged a Fourth Amendment claim against Chief Storti. While he did not go with O'Brien to the classroom, the complaint plausibly alleges Storti "affirmatively set in motion the trip" to the school. *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 51 (1st Cir. 2009). The complaint

further alleges Storti played a central role in working with O'Brien (and Dillon) to devise a strategy to investigate Plaintiff, including by initiating a detention of her person in her classroom. (*See, e.g.*, Dkt. No. 16 ¶ 43 ("Dr. Dillon agreed with Chief Storti's plan to ambush [Plaintiff] and to search her classroom for the book Chief Storti determined, without any reasonable basis, to be 'obscene.'") The complaint also alleges Storti played a crucial role in deciding to forego any investigation into the veracity of the tipster's information and keeping the tipster's identify confidential. Under well established principles of Section 1983 causation, these allegations permit the court to "draw the reasonable inference that [Storti] is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678 (alteration added), not merely in a supervisory capacity, *see Wadsworth v. Ngyen*, 129 F.4th 38, 62 (1st Cir. 2025), but as a "primary violator" of Plaintiff's Fourth Amendment rights, *Sanchez*, 590 F.3d at 51. The court therefore concludes Plaintiff's unlawful seizure of the person claim against Storti individually is sufficiently pled.

By contrast, the allegations of the complaint fail to give rise to a plausible inference that Superintendent Dillon violated Plaintiff's right to be free from an unlawful seizure of the person. The allegations essentially amount to an assertion that Dillon allowed an officer to go to the school, after the chief of police told him a classroom contained "pornographic illustrations," and after an allegation that a teacher let students sit on her lap. (Dkt. No. 16 ¶ 40.) The complaint also affirmatively alleges Dillon was not told the name of the informant, rendering it impossible for him to step in and verify the informant's bias. Dillon, moreover, is not alleged to have been familiar with *Gender Queer*. Nor is it plausible to infer that a school superintendent, when confronted by the local police department claiming an urgent need to enter the school, would do anything other than acquiesce to this show of authority. Even when viewed in a light most favorable to Plaintiff, these allegations do not allow the court to plausibly infer Dillon's direct liability for the alleged violation of Plaintiff's Fourth Amendment rights. Accordingly, the unlawful seizure of the person claim is dismissed as to Dillon.

### b. *Qualified Immunity*

Defendants Storti and O'Brien have also invoked the defense of qualified immunity. The court must, therefore, "determine whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Alfano v. Lynch*, 847 F.3d 71, 75 (1st Cir. 2017) (internal quotation marks omitted). The court first asks whether there is "controlling authority or a consensus of cases of persuasive authority sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." *Id.* at 75. If the answer to the first question is yes, the court then "asks whether an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law." *Id.* at 76.

As to the first prong, "the clearly established law must not be gauged at too high a level of generality," but "there is no requirement of identicality." *Id.* "[I]t is enough if the existing precedents establish the applicable legal rule with sufficient clarity and specificity to put the official on notice that his contemplated course of conduct will violate that rule." *Id.*; *see also Pike v. Budd,* 133 F.4th 74, 91 (1st Cir. 2025).

The use of obscenity laws to regulate literary works has a long tradition in the United States, particularly in the Commonwealth of Massachusetts, where the Watch & Ward Society infamously implemented a regime so stringent that the term "banned in Boston" became a synonym for censorship.[12] The application of these laws to books spawned a "tortured history of [Supreme Court] obscenity decisions," ultimately leading to *Miller v. California*, 413 U.S. 15, 19 (1973) (alteration added). This decision established a new standard for obscenity: "confin[ing] the permissible scope of such

---

[12] *See, e.g., Memoirs v. Massachusetts*, 383 U.S. 413, 418-19 (1966) (overturning SJC's finding of obscenity); *Poe v. Ullman*, 367 U.S. 497, 520 n. 10 (1961) (Douglas, J., dissenting) (describing the origins of censorship in the Northeast); *Nationalist Movement v. City of Bos.*, 12 F. Supp. 2d 182, 195 (D. Mass. 1998) ("[C]ity officials behaved like a latter-day Watch and Ward Society guarding against offensive political opinions, and they fell into the same public relations predicament as their forebears.").

regulation to works which depict or describe sexual conduct . . . [with the conduct] specifically defined by the applicable state law, as written or authoritatively construed . . . [and enforcement of the provision] limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value." *Id.* at 24 (alterations added). The *Miller* Court further reiterated that "in the area of freedom of speech and press the courts must always remain sensitive to any infringement on genuinely serious literary, artistic, political, or scientific expression." *Id.* at 23.

In accordance with this constitutional gatekeeping role, the Supreme Court has issued numerous decisions "impos[ing] particularized rules applicable to searches and seizures related to allegedly obscene films, books, and papers." *Maryland v. Macon*, 472 U.S. 463, 468 (1985) (alteration added); *see also Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, 63-64, 65 (1989) ("[O]ur cases firmly hold that mere probable cause to believe a legal violation has transpired is not adequate to remove books or films from circulation."); *New York v. P.J. Video, Inc.*, 475 U.S. 868, 873 (1989); *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 326 n. 5 (1979); *Heller v. New York*, 413 U.S. 483, 492-93 (1973); *Roaden v. Kentucky*, 413 U.S. 496, 506 (1973); *Quantity of Copies of Books v. State of Kansas*, 378 U.S. 205, 210-12 (1964); *Marcus v. Search Warrants of Prop. at 104 E. Tenth St., Kansas City, Mo.*, 367 U.S. 717, 728-33 (1961). These well established precedents forbid police officers from making an obscenity determination for themselves and then relying on that determination to initiate a search or seizure, as the Constitution requires the decision be left to a neutral magistrate. *See P.J. Video, Inc.*, 475 U.S. at 873-74; *see also Stanford v. State of Tex.,* 379 U.S. 476, 485 (1965) ("The constitutional impossibility of leaving the protection of those [First Amendment] freedoms to the whim of the officers charged with executing the warrant is dramatically underscored by what the officers saw fit to seize under the warrant in this case."). There is an abundance of authority and law enforcement history informing a reasonable officer that, since at least the 1970s, it would violate the Fourth Amendment to initiate the seizure of a person during a

search for a book the officer thought obscene, absent a prior judicial finding or search warrant authorization. Without one of these two judicial acts, there cannot be probable cause or reasonable suspicion. "To hold otherwise would be false to the terms of the Fourth Amendment, false to its meaning, and false to its history." *Stanford*, 379 U.S. at 486.

In reaching this conclusion, the court considered whether *Maryland v. Macon*, 472 U.S. 463, required application of qualified immunity to this case. *Id.* at 471. The Supreme Court's decision in that case expressly reserved ruling on "whether the Fourth Amendment prohibits a warrantless arrest for the state law misdemeanor of distribution of obscene materials." *Id.* For several reasons, however, the court is persuaded this reservation does not render the law applicable to this case unsettled. *Macon* arose from a controlled purchase of magazines by undercover officers. *Id.* at 465. Reasoning this outwardly lawful purchase did not implicate "[t]he risk of prior restraint, which is the underlying basis for the special Fourth Amendment protections accorded searches for and seizures of First Amendment materials," the Supreme Court refused to find the subsequent arrest, which it assumed unconstitutional for purposes of the decision, required application of the exclusionary rule because the evidence had been obtained before the illegal arrest. *Id.* at 470.[13] By contrast, here, there was no controlled purchase aspect but rather "action taken by government agents that can properly be classified as a search or a seizure," triggering "the Fourth Amendment rules designed to safeguard First Amendment freedoms." *Id.* at 468-69.

In the court's view, the allegations in the complaint are more akin to the facts in *Roaden v. Kentucky*, 413 U.S. 496, where the Supreme Court held unlawful a law enforcement officer's impromptu decision to seize both an allegedly obscene film and the individual exhibiting the film, as this act was "plainly a form of prior restraint." *Id.* at 498-99, 504; *see also P.J. Video, Inc.*, 475 U.S. at

---

[13] As a matter of state law, the procedure used by the officers in *Macon* was illegal in Massachusetts. *See Zone Book, Inc.,* 361 N.E.2d at 1241, 1244.

873. Here, too, the actions of Storti and O'Brien are plausibly understood as a form of prior restraint. *Id.* at 504-05; *see also Penthouse Int'l, Ltd. v. McAuliffe,* 610 F.2d 1353, 1359 (5th Cir. 1980). And, unlike the undercover purchase in *Macon*, which did not involve an investigatory detention, the complaint plausibly implicates the Fourth Amendment's engrained "[h]ostility to seizures based on mere suspicion," as "[n]othing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed arrests or investigatory detentions." *Dunaway v. New York*, 442 U.S. 200, 213-15 (1979); *Roaden*, 413 U.S. at 504; *Stanford*, 379 U.S. at 483-485 (explaining the Fourth Amendment was heavily influenced by *Wilkes v. Wood*, 95 Eng. Rep. 489 (K.B. 1763), and *Entick* v. *Carrington*, 95 Eng. Rep. 807 (K.B. 1765), cases rejecting the use of general warrants to "apprehend and seize, together with their papers" individuals suspected of seditious libel).

As to the second prong of the clearly established analysis, the complaint plausibly alleges that objectively reasonable officers in a similar position to O'Brien and Storti would have understood their actions violated the law. *See Est. of Rahim by Rahim v. Doe,* 51 F.4th 402, 413 (1st Cir. 2022) (discussing the second prong of the legal test). This investigation relied on Mass. Gen. Law ch. 272, § 29, but law enforcement failed to comply with any of the precedent procedural requirements contained in Chapter 272. These procedural requirements (Mass. Gen. Laws ch. 272, § 28I) become clear by simply checking the section titles in Chapter 272. While there is no requirement that a police officer be "charged with predicting the future course of constitutional law," here, there was no need for the officers to predict anything. *Pierson v. Ray*, 386 U.S. 547, 557 (1967). Similarly, while an unusual factual scenario could support application of qualified immunity, in the circumstances of this case, the investigation into books by the police are unusual only because the Supreme Court and state law have historically and repeatedly warned that they must only be undertaken with strong judicial guardrails in place. It would be a misapplication of the doctrine of qualified immunity to allow officers to escape liability because

a set of rights had been so clearly established years prior, that current officers can consequently profess no knowledge with the directives of the law they referenced as controlling at the inception of the police investigation. As plausibly alleged in the operative complaint, law enforcement did not conduct any meaningful investigatory assessment with guidance from the well established law controlling procedure and prosecutions under Mass. Gen. Law ch. 272.

Accordingly, it was clearly established on December 8, 2023 that a reasonable officer would violate the federal constitution by detaining Plaintiff without a judicial determination that *Gender Queer* was obscene. The court therefore concludes O'Brien and Storti are not entitled to dismissal on qualified immunity grounds at this stage of the litigation.

### 3. First Amendment

"The right to speak on matters of public concern is guaranteed by the First Amendment." *MacRae v. Mattos*, 106 F.4th 122, 132 (1st Cir. 2024). As a corollary to this protection, "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (internal quotation marks omitted). Plaintiff advances a theory of First Amendment retaliation against each of the individual Defendants, but because Plaintiff's relationship to Defendants O'Brien and Storti, in their role as police officers, is differently situated than her relationship to Superintendent Dillon, in his role as a representative of her employer, the analysis as to the sufficiency of her claim varies slightly between the Defendants.

To state a claim against O'Brien and Storti, Plaintiff must first plausibly allege that her "conduct was constitutionally protected." *Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134, 141 (1st Cir. 2016); *see also O'Neil v. Canton Police Dep't,* 761 F. Supp. 3d 299, 311 (D. Mass. 2024). She must then allege "she was subjected to an adverse action by defendant," *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012), and the complaint "must show proof of a causal connection between

the allegedly protected conduct and the supposedly retaliatory response," *Najas Realty, LLC*, 821 F.3d at 141. For purposes of this analysis, "an adverse action is an action that would deter a reasonably hardy person from exercising his or her constitutional rights." *D.B. ex rel. Elizabeth B.*, 675 F.3d at 43 n. 11. "Causation [meanwhile] is established by showing that the plaintiff's conduct was a 'substantial' or 'motivating' factor in bringing about the allegedly retaliatory action." *Goldstein v. Galvin*, 719 F.3d 16, 30 (1st Cir. 2013) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)) (alteration added).

Here, Plaintiff has adequately alleged that her possession of *Gender Queer* is constitutionally protected conduct. "The First Amendment protects works which, taken as a whole, have serious literary, artistic, political, or scientific value, regardless of whether the government or a majority of the people approve of the ideas these works represent." *Miller v. California*, 413 U.S. 15, 34 (1973). The complaint also sufficiently alleges an adverse action, as the arrival of a plain clothes police officer inquiring into ownership of a literary work at one's place of employment (accompanied by one's employer) can be plausibly viewed as likely to deter a reasonably hardy individual from exercising their right to own the specific book. This is especially true when that police officer, in the presence of the employer, asserts the book contains unlawful child sexual material. Causation has also been adequately alleged, as there is no doubt from the complaint and the exhibits annexed thereto that Plaintiff's possession of *Gender Queer* was the motivating factor behind Storti's and O'Brien's alleged retaliation. Finally, as to qualified immunity for the officers, the court is persuaded that it has long been clearly established that government agents cannot use "the power of the State to punish or suppress disfavored expression," and therefore dismissal on qualified immunity grounds is not appropriate. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024); *see also Rosenberger v. Rector & Visitors of Univ. of Virginia,* 515 U.S. 819, 828 (1995) ("Discrimination against speech because of its message is presumed to be unconstitutional."); *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 67 (1963) (holding

unconstitutional "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation . . . to achieve the suppression of publications deemed objectionable").

By contrast, rather than analyze whether the complaint adequately alleges a claim under the appropriate constitutional framework as to Superintendent Dillon,[14] the court will assume without deciding that it does and proceed to conclude he is entitled to qualified immunity on this claim. *See Belsito Commc'ns, Inc. v. Decker,* 845 F.3d 13, 23 (1st Cir. 2016) (noting courts may proceed "with [the] qualified-immunity steps in any order [they] please" (alterations added)). Plaintiff has not pointed the court to "controlling authority or a consensus of persuasive authority sufficient to put the [superintendent] on notice that [his] conduct violated the law." *Est. of Rahim by Rahim v. Doe,* 51 F.4th 402, 412-13 (1st Cir. 2022). Moreover, an objectively reasonable superintendent, confronted by the factual scenario alleged in the complaint, would not have understood that allowing police officers to enter the school to investigate Plaintiff and search her classroom would constitute a violation of her First Amendment rights vis-à-vis the school district. Under the *Garcetti* framework, it would not have been clear to a reasonable superintendent that possessing *Gender Queer* in the classroom would qualify as speaking as a citizen on a matter of public concern at step one of the framework, nor would it have been clear that the allegations presented by officers were an inadequate justification for treating Plaintiff differently than a member of the general public under the *Pickering* balancing test applicable at step two of the framework. *See generally Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty.,*

---

[14] As a representative of Plaintiff's employer, Superintendent Dillon's actions would typically be analyzed under the framework set forth in *Garcetti v. Ceballos,* 547 U.S. 410 (2006). This approach asks "(1) whether the employee spoke as a citizen on a matter of public concern, (2) whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public, and (3) whether the plaintiff can show that the protected expression was a substantial or motivating factor in the adverse employment decision." *Barton v. Clancy,* 632 F.3d 9, 28 (1st Cir. 2011) (internal quotation marks omitted); *see also MacRae v. Mattos,* 106 F.4th 122, 133 (1st Cir. 2024).

*Illinois,* 391 U.S. 563 (1968).[15]

Accordingly, Count I may proceed only as to Storti and O'Brien; it is dismissed on qualified immunity grounds as to Dillon.

4. *Equal Protection*

A plaintiff pressing an equal protection claim must allege that "compared to others, similarly situated, [she] was selectively treated . . . based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Lay v. City of Lowell*, 759 F. Supp. 3d 247, 254 (D. Mass. 2024) (quoting *Marrero-Gutierrez v. Molina*, 491 F.3d 1, 9 (1st Cir. 2007)). Unless a plaintiff is a member of a "suspect" or "quasi-suspect" class and alleges direct factual support for the existence of discriminatory animus, pleading an equal protection claim typically requires identification of a "similarly situated" comparator. *Wadsworth*, 129 F.4th at 54; *see also id.* at 72-73 (Rikelman, J., concurring); *McKenna by & through McKenna v. Maine Dep't of Health & Hum. Servs.*, 152 F. 4th 14, 21 (1st Cir. 2025). "An individual is 'similarly situated' to others for equal protection purposes when 'a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'" *Davis v. Coakley*, 802 F.3d 128, 133 (1st Cir. 2015) (quoting *Barrington Cove Ltd. P'ship v. Rhode Island Hous. & Mortgage Fin. Corp.*, 246 F.3d 1, 8 (1st Cir.2001)). "[E]xact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.'" *Id.* (quoting *Barrington Cove*, 246 F.3d at 8).

Plaintiff alleges she is a member of two "suspect" classes on account of her sexual orientation and her Mexican American heritage. However, the First Circuit has explicitly declined to recognize

---

[15] Under *Pickering*, the court weighs "the value of an employee's speech against the employer's legitimate government interest in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." *MacRae v. Mattos*, 106 F.4th 122, 136 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2617 (2025).

sexual orientation as a suspect class for equal protection purposes. *Cook v. Gates*, 528 F.3d 42, 61 (1st Cir. 2008); *see also Massachusetts v. U.S. Dep't of Health & Hum. Servs.,* 682 F.3d 1, 9-10 (1st Cir. 2012). The court must adhere to this binding precedent. *Massachusetts*, 682 F.3d at 9 ("[E]xtending intermediate scrutiny to sexual preference classifications is not a step open to [this court]" (alterations added)). Alienage, race, and nationality, on the other hand, are suspect classifications for purposes of the Equal Protection Clause. *Bruns v. Mayhew*, 750 F.3d 61, 66 (1st Cir. 2014). But the complaint does not plausibly allege the actions of Defendants were taken because of their animus toward Mexican Americans. Rather, the allegations strongly indicate a belief she was subject to the allegedly discriminatory actions because of her sexual orientation which, as the court just explained, is not a recognized suspect classification.[16]

Having failed to allege she was treated disparately due to her membership in a suspect class, Plaintiff must allege the existence of an appropriate comparator. In furtherance of this requirement, the complaint alleges:

> Other educators in the District similarly chose to place a copy of Gender Queer in their respective classrooms, including to address the important issue of gender identity and confronting opposition to the reality of that issue. At least one of those educators was a heterosexual, white man and none of those educators experienced the unlawful treatment which Ms. Galdós-Shapiro did, as described below.

---

[16] However, "[a]lthough sexual orientation has not been recognized in this circuit as a suspect or quasi-suspect classification, homosexuals do constitute an 'identifiable group' for equal protection purposes," so Plaintiff's claim "alleging discrimination on the basis of sexual orientation . . . should not be characterized as a 'class-of-one' claim." *Davis v. Prison Health Servs.*, 679 F.3d 433, 441 (6th Cir. 2012); *see also Nabozny v. Podlesny*, 92 F.3d 446, 457 (7th Cir. 1996). Instead, this means that Plaintiff must generally allege an adequate comparator, and the government's actions are judged under the more relaxed rational basis standard. But, even under the rational basis standard, "the desire to effectuate one's animus against homosexuals can never be a legitimate governmental purpose, [and] a state action based on that animus alone violates the Equal Protection Clause." *Id.* at 438 (internal quotation marks omitted); *see also de la Fuente Diaz v. Gonzalez Colon*, 786 F. Supp. 3d 453, 462 (D.P.R. 2025) ("Moral disapproval of or animus towards a specific group are not considered legitimate state interests under the rational basis test."); *Collymore v. McLaughlin*, 2016 WL 6645764, at *3 (D. Mass. Nov. 8, 2016).

(Dkt. No. 16 ¶ 26.) It further alleges the tipster "noted that other teachers were present during the alleged criminal acts, yet no attempts were made by the Defendants to obtain their identify, interrogate them, or search their classrooms." (*Id.* ¶ 31.) "In addition," the complaint continues, "there were other teachers in the Middle School who housed Gender Queer in their classrooms that are not part of the LGBTQ+ community, were not associated with the GSA, and who identify as white, but at no point were their classrooms searched nor were they interrogated," and "[d]espite this information being relayed to Officer O'Brien, he made no attempt to investigate those teachers or search their classroom as he did to [Plaintiff]." (*Id.* ¶ 31; *see also id.* ¶ 105.) The first allegation is insufficient to meet the comparator requirement, as the fact other educators in the *school district* had the book does not establish the requisite level of similarity. The second allegation is also insufficient because the complaint makes clear that O'Brien only questioned Plaintiff about the accusations relating to the book, not the other acts (such as lap-sitting). The third allegation, however, plausibly supports an equal protection claim against O'Brien. The court plausibly infers that O'Brien was made aware of the book's presence in other specific classrooms (of teachers who do not identify as LGBTQ), yet he made no efforts to identify or investigate those other teachers or classrooms and instead confined his investigation to Plaintiff and her classroom only. Viewing these facts in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, the court concludes that O'Brien's actions in limiting the investigation to Plaintiff support an equal protection claim at this stage.

The court also concludes Plaintiff has pled a plausible equal protection claim against Storti. At the very least, even if the complaint has not plausibly alleged Storti was a "primary violator" of Plaintiff's equal protection rights, *Sanchez*, 590 F.3d at 51, it has alleged facts plausibly demonstrating supervisory liability. Under § 1983, a supervisor may be held liable even though their "actions have not directly abridged someone's rights; it is enough that [they have] created or overlooked a clear risk of future unlawful action by a lower-echelon actor over whom [they] had some degree of control.'"

*Wadsworth*, 129 F.4th at 62 (quoting *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999)). "Liability attaches where '(1) the behavior of [the] subordinates results in a constitutional violation, and (2) the [supervisor]'s action or inaction was affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence[,] or gross negligence amounting to deliberate indifference.'" *Id.* at 62-63 (quoting *Pineda v. Toomey*, 533 F.3d 50, 54 (1st Cir. 2008)). Plaintiff's allegations regarding Storti, when viewed in the light most favorable to Plaintiff, meet this standard. Plaintiff's complaint alleges Storti directed the plan to have O'Brien confront Plaintiff in her classroom. In addition, Storti was actively involved in the aftermath of the incident, issuing a press release which essentially defended the conduct of GBPD, and he had a history of anti-LGBTQ actions with regard to the school district. These allegations suggest Storti's actions were affirmatively linked to O'Brien's behavior as supervisory encouragement and condonation. The court therefore concludes it is plausible to infer, at this early stage, that Storti may be held liable under a supervisory liability theory for the equal protection violation.

The court also rejects, at this stage, O'Brien's and Storti's qualified immunity arguments. As to O'Brien, the Seventh Circuit in 1996 explained the following "well established principle: the Constitution prohibits intentional invidious discrimination between otherwise similarly situated persons based on one's membership in a definable minority, absent at least a rational basis for the discrimination. There can be little doubt that homosexuals are an identifiable minority subjected to discrimination in our society." *Nabozny*, 92 F.3d at 457. Moreover, the First Circuit recently explained that "[q]ualified immunity is a 'good faith' immunity involving the presumptive knowledge and respect for 'basic unquestioned constitutional rights,'" and "[i]f intentional discrimination has occurred, then 'good faith' immunity is logically excluded." *Pike* at 96 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)). Here, Plaintiff has plausibly alleged O'Brien engaged in intentional discrimination based on Plaintiff's sexual orientation when he failed to investigate other teachers believed to have *Gender Queer*

in their classrooms after being apprised of that fact and instead confined his investigation to only Plaintiff. The court concludes a reasonable officer in O'Brien's position would have known such conduct, as alleged in the complaint, violated the law. Similarly, as to Storti, the supervisory liability standards were clearly established when the events at issue in this case occurred. *See Penate v. Hanchett*, 944 F.3d 358, 366 (1st Cir. 2019). Moreover, a reasonable officer would have understood that Storti's actions, viewed in the light most favorable to Plaintiff, subjected him to supervisory liability, since Storti put the plan to visit Plaintiff's classroom into motion, he condoned and defended O'Brien's actions through the press release, and Storti himself allegedly harbored anti-LGBTQ animus, which he had previously acted on with regard to the school district.

The court, however, reaches a different conclusion as to Dillon. Unlike Storti, Superintendent Dillon was not O'Brien's supervisor and did not direct the plan to have O'Brien confront Plaintiff in her classroom. Dillon merely agreed to allow the GBPD to go to the classroom and asked that Principal Wheat cooperate with the investigation. Moreover, unlike O'Brien, Dillon did not conduct *any* investigation whatsoever. Accordingly, Dillon's failure to investigate other similarly situated teachers who possessed *Gender Queer* in their classrooms—which Dillon would have no reason to know about—does not support an equal protection claims against him.

Plaintiff's equal protection claim (Count III) will therefore be dismissed as to Dillon but survives as to O'Brien and Storti.

### 5. *Monell Liability*

Under Section 1983, "[m]unicipalities cannot be held liable for the conduct of their employees unless the municipality itself is also responsible in some way for that conduct." *Lavigne v. Great Salt Bay Cmty. Sch. Bd.*, 146 F.4th 115, 123 (1st Cir. 2025) (citing *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978)). To satisfy the requirements of *Monell*, the complaint must allege (1) a constitutional violation, and (2) "the existence of a municipal policy or custom directing or requiring the allegedly

unconstitutional actions." *Id.* As the court may address the elements in either order, Count II (Fourth Amendment), to the extent it alleged an unlawful search, is dismissed as to Great Barrington for failing to allege an underlying constitutional violation. *Id.* at 124.

Turning to Great Barrington's liability as to Count I, the remainder of Count II, and Count III, "[a]n official municipal policy can take the form of either an officially adopted policy statement or regulation, . . . , or an informal custom amounting to a widespread practice that, although not authorized by written law, is so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* at 125 (internal citations and quotation marks omitted). However, "[t]he Supreme Court has also held that if 'authorized policymakers approve a subordinate's decision and the basis for it,' that ratification is chargeable to the municipality as an official policy or custom 'because their decision is final.'" *Id.* (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion)); *see also Welch v. Ciampa*, 542 F.3d 927, 942 (1st Cir. 2008) ("[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986))). "When determining whether a decisionmaker exercises final authority, [c]ourts must look to state law, including valid local ordinances and regulations, for descriptions of the duties and obligations of putative policymakers in the relevant area at issue." *Freeman v. Town of Hudson*, 714 F.3d 29, 38 (1st Cir. 2013) (internal quotation marks omitted).

Here, the complaint plausibly alleges Chief Storti had final decision-making authority for purposes of initiating the investigation into Plaintiff. Initiation of this investigation was the moving force behind the alleged retaliation in Count I, the alleged unlawful seizure of a person in Count II, and the equal protection violation alleged in Count III. As explained, the complaint alleges Storti was intimately involved in both the planning and aftermath of the school visit; he directed O'Brien to confront Plaintiff in her classroom and defended O'Brien's actions through an official press release

after the fact. At this stage of the litigation, the court concludes Plaintiff has adequately alleged *Monell* liability as to the Town of Great Barrington based on a final policymaker theory.

Accordingly, the motion to dismiss as to Great Barrington is denied as to Count I and Count III, and granted in part and denied in part as to Count II.

### B.    State Law Claims

#### 1.   MCRA

The Massachusetts Civil Rights Act ("MCRA") "creates remedies for '[a]ny person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with [by any person, whether or not acting under color of law, by threats, intimidation or coercion].'" *Currier v. Nat'l Bd. of Med. Examiners*, 965 N.E.2d 829, 837 (Mass. 2012) (quoting Mass. Gen. Law ch. 12, § 11I) (alterations in original). Questions of liability and interpretation under the MCRA are generally coextensive with questions of liability and interpretation under Section 1983, but MCRA claims do not include the "state action" requirement of Section 1983 claims, thereby allowing an MCRA action to proceed against a private individual. *See Batchelder v. Allied Stores Corp.,* 473 N.E.2d 1128, 1129-30 (Mass. 1985). "To establish a claim under the [MCRA], a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion." *Waterman v. City of Taunton,* 742 F. Supp. 3d 144, 164 (D. Mass. 2024) (quoting *Barron v. Kolenda*, 203 N.E.3d 1125, 1139-40 (Mass. 2023)) (alteration in original).

In the operative complaint, Plaintiff relies on the First and Fourth Amendments as the basis for the MCRA claim. Because a direct violation of Fourth Amendment rights does not amount to a violation of the MCRA, this claim is not viable to the extent it asserts a direct violation of the Fourth Amendment as the predicate. *See Longval v. Comm'r of Correction,* 535 N.E.2d 588, 593 (Mass. 1989) ("A

direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the Act"); *see also Santiago v. Keyes,* 890 F. Supp. 2d 149, 154-55 (D. Mass. 2012). However, to the extent the complaint alleges Storti and O'Brien retaliated against her, including by violating her Fourth Amendment rights, for possessing *Gender Queer*, the complaint states an MCRA claim, as retaliation for engaging in protected First Amendment activity is coercive under Massachusetts law. *See Barron,* 203 N.E.3d at 1140; *Batchelder,* 473 N.E.2d at 1131; *Waterman,* 742 F. Supp. 3d at 164-65; *see also Planned Parenthood League of Massachusetts, Inc. v. Blake,* 631 N.E.2d 985, 990 (Mass. 1994) ("Intimidation [under the MCRA] involves putting in fear for the purpose of compelling or deterring conduct." (internal quotation marks omitted and alteration added)); *Thomas v. Harrington*, 909 F.3d 483, 492 (1st Cir. 2018) ("[T]he MCRA contemplates a two-part sequence: [liability may be found where] (1) the defendant threatens, intimidates, or coerces the plaintiff, in order to (2) cause the plaintiff to give up something that [she] has the constitutional right to do." (internal quotation marks omitted)).[17] As to Superintendent Dillon, on the other hand, the complaint does not plausibly allege he interfered with Plaintiff's First Amendment rights through threats, intimidation, or coercion, as the allegations of the complaint do no more than establish he responded to what, he believed at the time, to be the legitimate requests of police officers.

Accordingly, the MCRA claim is dismissed as to Dillon, but will be allowed to proceed as to Storti and O'Brien to the extent it alleges they interfered with Plaintiff's First Amendment rights through threats, intimidation, or coercion.

    *2. Civil Conspiracy*

Massachusetts law recognizes two forms of civil conspiracy: "concerted action" conspiracy

---

[17] Again, the court also rejects O'Brien's and Storti's qualified immunity arguments as to the MCRA claim at this stage. The court concludes reasonable officers in their shoes would understand that, as alleged by Plaintiff, subjecting a teacher to an unreasonable seizure in retaliation for engaging in protected First Amendment activity was unlawful. *See Barron,* 203 N.E.3d at 1141.

and "true" conspiracy. *Greene v. Philip Morris USA Inc.*, 208 N.E.3d 676, 682 (Mass. 2023). Plaintiff's opposition indicates she is pursuing a concerted action theory of conspiracy liability. Concerted action conspiracy is "akin to a theory of common law joint liability in tort." *Id.* at 683 (internal quotation marks omitted). "Because it is vicarious liability, this type of civil conspiracy requires an underlying tort. . . . The conspiracy consists in agreeing to, or assisting in, this underlying tort." *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 35 (1st Cir. 2009) (citation omitted). It "applies to a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result." *Greene*, 208 N.E.3d at 683 (internal quotation marks omitted). The concerted action theory may also apply when the plaintiff alleges the defendants "gave substantial assistance to the tortfeasor's conduct," and the tortfeasor's conduct constituted a "breach of duty." *Thomas*, 909 F.3d at 490-91. However, "liability under this theory only applies to 'assistance or encouragement that is a substantial factor in causing the resulting tort.'" *Id.* at 491 (quoting *Taylor*, 576 F.3d at 35).

The complaint does not plausibly allege conspiracy liability under either a common plan or substantial assistance theory. Plaintiff identifies two underlying torts, for which she seeks leave to include in her second amended complaint: defamation and intentional infliction of emotional distress. However, as explained in more detail in the Motion to Amend section, the court concludes two of the three defamation theories as well as the intentional infliction of emotion distress claim are not viable. That leaves only the defamation theory based on Storti's issuance of the press release as a potential underlying tort. But neither the operative complaint nor the proposed second amended complaint contain any allegations or plausible inferences suggesting that O'Brien or Dillon took actions which encouraged or assisted in the commission of that specific tort in any way.

Accordingly, the court concludes Plaintiff has not alleged a plausible conspiracy claim against any Defendant and dismisses Count V.

## C.    Motion to Amend

Plaintiff seeks leave to file a second amended complaint, alleging defamation and intentional infliction of emotional distress claims against Dillon, Storti, and O'Brien in their official and individual capacities.[18] Although Plaintiff's delay before seeking to file the second amended complaint was substantial, the court finds the request timely, as this litigation has not progressed past the motion to dismiss stage. The court additionally finds there is no prejudice to either set of Defendants, as they have undoubtedly been on notice that these claims could be brought for a substantial period. The notion that Defendants' obligation to respond to a second amended complaint constitutes prejudice is unavailing in view of the substantial briefing on the question of futility which, as they note, is functionally equivalent to a motion under Rule 12(b)(6).

Having concluded the motion to amend was both timely and nonprejudicial, the court must still analyze whether the additional claims are futile. In determining futility, the court applies the same plausibility standard used when considering a motion to dismiss under Rule 12(b)(6). *See Efron v. UBS Fin. Servs. Inc. of Puerto Rico,* 96 F.4th 430, 437 (1st Cir. 2024).

### 1.    *Defamation*

To state a defamation claim under Massachusetts law, a plaintiff must allege: "(1) that '[t]he defendant made a statement, concerning the plaintiff, to a third party'; (2) that the statement was defamatory such that it 'could damage the plaintiff's reputation in the community'; (3) that '[t]he defendant was at fault in making the statement'; and (4) that '[t]he statement either caused the plaintiff economic loss . . . or is actionable without proof of economic loss.'" *Shay v. Walters*, 702 F.3d 76, 81

---

[18] When citing the proposed amended complaint, the court will cite the redlined version comparing the proposed complaint to the operative complaint. (Dkt. No. 38-1.) Furthermore, to the extent these claims are alleged against the individual Defendants in their official capacity, leave to amend is denied as futile. The MTCA does not permit intentional tort claims to proceed against government officials in their official capacity. *See Nelson v. Salem State Coll.,* 845 N.E.2d 338, 341 n. 2 (Mass. 2006).

(1st Cir. 2012) (quoting *Ravnikar v. Bogojavlensky,* 782 N.E.2d 508, 510-11 (Mass. 2003)).

In proposed Count VII, Plaintiff identifies three potentially defamatory statements. The court will begin its analysis with the first in time of these communications, Superintendent Dillon's December 14 email to the "BHRSD Community." (Dkt. No. 38-1 at 64-65.) As a threshold question of law, the email is not reasonably susceptible of a defamatory meaning. *Shay v. Walters*, 702 F.3d 76, 81 (1st Cir. 2012). A communication is reasonably susceptible to a defamatory meaning if, when viewed in the entire context of the publication, "it would tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community." *Id.* Dillon's email, adverting to Plaintiff only once in passing and not at all by name, cannot be construed to meet this standard. Rather, the email is more fairly read as defending the presence of the book in the school by, for example, noting, "[i]t has won several awards" and tells "an important story helping build empathy and support for a marginalized group and helping trans or queer students make meaning." (Dkt. No. 38-1 at 64.) Dillon further concluded by reiterating the school district has a process for reviewing books, before observing "[m]ost [schools] in the Northeast have kept [*Gender Queer*]." *Id.* at 65. The tone, text, and surrounding circumstance of the email do not support a conclusion that the email tends to hold Plaintiff up to scorn, hatred, ridicule, or contempt in the community.

As an additional basis for finding futility, even if the court accepts the email is defamatory, "[s]tatements made by public officials while performing their official duties are conditionally privileged." *Mulgrew v. City of Taunton*, 574 N.E.2d 389, 392 (Mass. 1991); *see also 3137, LLC v. Town of Harwich,* 126 F.4th 1, 15-16 (1st Cir. 2025) (recognizing the privilege applies at the motion to dismiss stage). This conditional privilege may be lost if a plaintiff plausibly alleges "the defendant knowingly or recklessly published the defamatory statement," *Mulgrew*, 574 N.E.2d at 392; or if the defendant acted with malice, meaning the "defamatory words, although spoken on a privileged occasion, were

not spoken pursuant to the right and duty which created the privilege but were spoken out of some base ulterior motive," *Dragonas v. Sch. Comm. of Melrose*, 833 N.E.2d 679, 687 (Mass. App. Ct. 2005). Here, it is evident from both the content and context of the email that Dillon sent it in his capacity as superintendent. The complaint then fails to plausibly negate the application of the privilege, as it contains no facts supporting an inference that Dillon knowingly, recklessly, or maliciously published the December 14 email. *See Shay v. Walters,* 702 F.3d 76, 82 (1st Cir. 2012) ("While the plaintiff's complaint contains conclusory allegations about 'ill-will' and 'actual malice,' it contains no factual assertions that in any way lend plausibility to these conclusions."). Accordingly, leave to amend as to this claim and Defendant is denied.

Plaintiff next alleges O'Brien's report, as released in an unredacted form by the GBPD, supports a defamation claim. However, the proposed second amended complaint does not allege that either O'Brien or Storti released the police report in unredacted form; rather, it merely alleges "the GBPD" "released the Criminal Complaint in its unredacted form, making public [Plaintiff's] name, home address, and date of birth." (Dkt. No. 38-1 ¶¶ 66, 125.) In contrast, the proposed second amended complaint makes clear that Storti himself issued the press release, addressed below. (Dkt. No. 38-1 ¶¶ 68-69, 126.) With regard to the police report, therefore, Plaintiff has not alleged facts showing that these individual defendants, rather than another individual or individuals in the GBPD, were responsible for the unredacted release of the police report. Accordingly, on these facts, neither O'Brien nor Storti can be held liable under a defamation theory for this release of the unredacted police report. Moreover, to the extent the complaint seeks to hold O'Brien liable for creating the report, the court finds no basis for this theory of defamation articulated in the complaint. O'Brien's creation of the report was conditionally privileged, and there are no facts alleged in the proposed amended complaint sufficient to overcome this privilege as to O'Brien's authorship of the report. *See Dear v. Devaney,* 983 N.E.2d 240, 246-48 (Mass. App. Ct. 2013). As a result, leave to amend as to the

defamation claim based on the police report as denied.

Finally, the proposed amended complaint alleges Chief Storti's December 16, 2023 press release supports the defamation claim. The court is persuaded by Plaintiff's arguments, as the allegation Plaintiff provided students a book "depict[ing] animated characters performing sexual acts on each other" was potentially defamatory.[19] (Dkt. No. 38-1 at 67.) Moreover, as alleged in the proposed complaint, Storti was aware on December 16 that the only student who ever took the book from Plaintiff's classroom did so with parental permission. He was also allegedly aware the book was not simply a compilation of sexual acts but rather was a work of literary and artistic value. By phrasing the press release in the manner chosen by Storti, at this stage, it is plausible to construe he intended the release to imply Plaintiff was routinely exposing children to illustrated images of child sex acts. In view of these allegations, as well as Storti's alleged history of animus toward the presence of LGTBQ ideas in schools, the court further concludes the complaint plausibly alleges Storti acted with either knowing, reckless, or malicious intent when he published the press release, rendering the conditional privilege inapplicable at this stage of the case.[20]

Accordingly, the court grants leave to add the defamation count, but only in so far as the count alleges Storti defamed Plaintiff through releasing the December 16 press release.

2. *Intentional Infliction of Emotional Distress*

In proposed Count VI, Plaintiff seeks leave to add a claim for intentional infliction of emotional distress as to each of the individual Defendants. After careful consideration, the court will

---

[19] In Massachusetts, truth is not a complete defense to defamation when the complaint plausibly alleges the defendant acted with actual malice. *See Noonan v. Staples, Inc.*, 556 F.3d 20, 28-29 (1st Cir. 2009) (citing Mass. Gen. Law ch. 231, § 92) Here, the complaint plausibly alleges Storti acted with common law actual malice, in light of Storti's alleged history of anti-LGBTQ bias.

[20] Application of the conditional privilege may be revisited at summary judgment with the benefit of a developed factual record.

deny leave to add this claim.

"The standard for making a claim of intentional infliction of emotional distress is very high." *Polay v. McMahon*, 10 N.E.3d 1122, 1128 (Mass. 2014). It requires Plaintiff to show (1) that Defendants intended, knew, or should have known their conduct would cause emotional distress; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. *Id.* The SJC has previously explained:

> Liability cannot be predicated on mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities, nor even is it enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.

*Id.* Rather, conduct is extreme or outrageous when it extends "beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." *Roman v. Trs. of Tufts Coll.*, 964 N.E.2d 331, 341 (Mass. 2012) (alteration added).

The court concludes that, while Defendants' conduct is troubling, it does not rise to the level of extreme or outrageous and utterly intolerable necessary to support an intentional infliction of emotional distress claim. *See Galvin v. U.S. Bank, N.A.*, 852 F.3d 146, 161 (1st Cir. 2017). As to O'Brien, after speaking with Principal Wheat (who vouched for Plaintiff's character), he limited his investigation to the book and did not ask Plaintiff any questions suggesting she had engaged in inappropriate physical contact with her students. O'Brien also questioned Plaintiff in relative privacy—behind a closed door in her classroom after the end of the school day with only her principal, rather than in front her colleagues or others, which could have been much more embarrassing.[21] Storti, for his part,

---

[21] Although the fact that O'Brien shut the door to Plaintiff's classroom before questioning her supports her claim of a Fourth Amendment seizure by suggesting she was not free to leave, shutting the door also served to protect her privacy during the encounter, thus undermining the contention that O'Brien's conduct was so extreme or outrageous as to be utterly intolerable in a civilized community.

did not directly participate in the encounter. Although Storti set the plan in motion and seemingly ratified the conduct of O'Brien afterwards, the court cannot conclude that his actions meet the high bar to support an intentional infliction of emotional distress claim. The same is true as to Dillon, who merely agreed to let the GBPD to go to Plaintiff's classroom and asked that Principal Wheat cooperate with the investigation. As alleged in the proposed second amended complaint, Dillon was not otherwise involved in the encounter and did not undertake an investigation into the book or the other allegations.

Plaintiff's allegations simply do not meet the exceptionally high standard necessary to support intentional infliction of emotional distress claims. Accordingly, the court denies leave to amend to add the intentional infliction of emotional distress count.

### 3. *Common Law Immunity*

In both their motion to dismiss and their opposition to the motion to amend, Storti and O'Brien contend any state law claims are barred by the doctrine of common law immunity. "Under the doctrine of common-law immunity, a public official exercising judgment and discretion is not liable for negligence or other errors during official decision-making, provided the official acted in good faith, without malice, and free of corruption." *Bresler v. Muster*, 258 N.E.3d 1134, 1146 (Mass. 2025). To overcome this immunity on a motion to dismiss, Plaintiff must plausibly allege Storti and O'Brien acted in bad faith or with malice. *Id.* "Bad faith is more than bad judgment or negligence, but rather suggest[s] a dishonest purpose or some moral obliquity, a conscious doing of wrong, or a breach of a known duty through some motive of interest or ill will." *Id.* (quotation marks omitted and alteration in original). "Malice constitutes a wrongful act, done intentionally, without just cause or excuse." *Id.* (quotation marks omitted)

Here, the court finds the complaint plausibly alleges Storti acted in bad faith or with malice as to the MCRA and defamation claims. Further, the court concludes Plaintiff has narrowly alleged

O'Brien acted with bad faith or malice as to the MCRA claim. These conclusions may be revisited at summary judgment with the benefit of an adequately developed record.

## V.    CONCLUSION

For the foregoing reasons, Superintendent Dillon's motion to dismiss is granted in its entirety. (Dkt. No. 21.) The Great Barrington Defendants' motion to dismiss is granted in part and denied in part. (Dkt. No. 17.) Specifically, it is granted as to Count II, to the extent that count alleges an unlawful search; and Count V. However, it is denied as to Count I; Count II, to the extent that count alleges an unlawful seizure of the person; and Count IV. Plaintiff's motion to file an amended complaint is granted in part and denied in part. (Dkt. No. 38.) Leave to add a defamation claim, limited to the December 16 press release, is granted. However, leave to assert a defamation claim based on the unredacted police report and Superintendent Dillon's email, and leave to assert an intentional infliction of emotional distress claim, is denied. Plaintiff shall docket an amended complaint conforming to this order within fourteen days.

It is So Ordered.


  /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge